ESTHER THAYER *v.* WHEELOCK S. THAYER, ANDREW M. THAYER, AMHERST C. THAYER, LUCY P. THAYER, AND MILLICENT KELLOGG.

## In Chancery.

A conveyance by the husband, shortly before his death, of all his property, both real and personal, to his children, without any *valuable* consideration, and with *the intent* to defeat his wife of her dower and her share of the personal estate, securing at the same time to himself the possession, use and control of it during his life, is fraudulent against the claims of the wife, and will be set aside.

Though the wife separate from the husband by reason of family discord, yet such separation is no forfeiture of her right of dower and her share of the personal estate, though she may have no justifiable cause of separation.

THIS case came to this court by appeal from the decree of the court of chancery for this county, at its September term, 1841, assigning to the oratrix dower in the real estate of her late husband, and ordering the defendants to pay her, by the time in said decree limited, a certain sum to make up, with what she had received, one third of the value of the personal estate left by her said husband, after payment of his debts and funeral expenses.

On the hearing in this court, on the bill, answers and testimony, the court found that Amherst Thayer, the husband of the oratrix, during his last sickness, and in expectation of soon dying, conveyed all the said estate, real and personal, to the defendant, Wheelock S. Thayer, his son, in trust for said Wheelock S. and the other defendants, all of whom were children of said Amherst Thayer, by a former marriage. There was no consideration for the conveyance, but that of love and affection, and it was made with the intent to defeat the oratrix of her dower in the lands, and of her share of the personal estate, of her said husband. The husband, at the same time, by taking a lease from said Wheelock S., secured to himself the possession and use of all the property, so conveyed, during his life, upon a nominal annual rent for the real estate.

It appeared from the testimony that there had been difficulty between the husband and wife, and that they had, shortly before his death, separated by mutual consent.

*A. O. Aldis* and *N. S. Whittemore,* for oratrix.

*Of the real property.*

1. The widow is entitled to one third of the real estate of which the husband dies seized. Vt. Stat. 367. As our statute has altered the common law right of dower, by restricting it to those lands of which the husband *dies seized,* we shall not be able to find any precedents in the English authorities, or even in the decisions of other states, (except, perhaps, Connecticut,) that would help to decide this case. It must be settled, therefore, upon general principles of reason, policy and equity, and by the application of analogous doctrines of law.

The wife is said to have both a civil and moral right to dower. *Banks* v. *Sutton,* 2 Pr. Wms. 702, 703. This right springs, first, from the nature of the marriage relation, and, by an implied agreement of the husband, upon entering into it, he is bound to support her during life, and his death would seem to be the occasion, of all others, when justice, affection and humanity unite to demand that a reasonable provision for her support should not be withdrawn. This agreement, on the part of the husband, is, in many of the old forms of marriage, directly expressed in words, as ' with all my worldly goods I thee endow.' The obligation to provide for her, after his death, is still more imperative when we consider the disablities which the wife incurs upon her marriage. She can acquire no property of her own, but all her earnings belong to her husband. All her personal property is thereby vested in him, and the use of all her real property. At his death, therefore, his estate is composed of all the personal property she had at marriage, of the rents and profits of all her real estate, and of all the earnings of her life. To deprive her of a reasonable share of what is really her own property, the fruits of her own labor and economy, to take away her support at the precise period of time when, on account of her bereavement, she is least able to bear up against adversity and most needs aid and consolation ; this is at war with all sense of justice and every sentiment of affection. A wise policy, too, which ever goes hand in hand with justice, encourages this provision for the widow, as tending to promote harmony and happiness in domestic life. The wife works cheerfully to accumulate an estate in which she

feels that her reasonable share is secured to her. She finds no capricious and arbitrary master in her husband, no rivals in her children. Her reasonable provision being fixed by law and placed beyond the control of her husband, all motives are withheld from unfilial children to embroil their parents in domestic strife.

The policy of securing to woman her just rights extends its influence beyond the scenes of domestic life, and promotes the general welfare of society. The laws which raise the condition of woman, become some of the most important causes in advancing the progress of civilization. Hence it may be noticed, in the histories of most nations, that their progress in civilization is uniformly accompanied with laws for improving the condition of the female sex.

The considerations here suggested have ever been deemed so consonant with natural affection, so strongly support-ed by the claims of justice, and so obviously required by a wise policy, that every civilized nation has established, by law, the right of dower, and sacredly protected it from the invasion of the husband. Even the rude Gothic and Teu-tonic tribes, in the dark ages, through all the vicisitudes of their wars and their changes of habitation, ever guarded the dowry of the wife. The civil, far more indulgent than the common law, made the wife the partner of the husband and gave her the sole control of her separate property. The common law, at first, gave for dower only the use of one-third of the lands of which the husband was seized at mar-riage, but, by *Magna Carta*, the right of dower was extended to one-third of all the lands of which the husband was seized during coverture, and various provisions were inserted for more effectually securing the widow against oppression. 1 Reeve's Hist. England, p. 241, 242. From the time of *Magna Carta*, the law has remained unaltered in England, and most of the states where the common law prevails, and so watchful have the courts been to protect the rights of the widow, that it has become a maxim in the books that dower is a favorite of the law.

II. The construction of the statute which the defendants contend for, is not demanded by the object which the legis-lature had in view in altering the common law. Their intent was to remove an embarrassing restraint upon the

alienation of lands. They did not seek to diminish or embarrass the wife's right to a support from her husband's estate upon his death. On the contrary, such intent is uniformly disclaimed in the text books on this subject, and it is asserted that the old law was thought to give but little practical protection to the wife's rights. 4 Kent's Com. 41. It has never been suggested nor agitated in this state that dower should be left to the sole control and discretion of the husband. Our statutes fix the amount of dower, forbid the husband from altering it by will, and prefer it to the claims of creditors;—thus recognizing every principle of the common law which gives it protection. Rev. Stat. 262, 289.

The fair operation of our law, as it stands, can work no -wrong to the wife, for in all *bona fide* conveyances of lands, the money received on the sale becomes a part of the personal property, of which the wife may have her assignment. Give to our statute the construction the defendants ask, and the wife is reduced, in this state, to a more abject condition than she is in any civilized nation, or than she ever was among the rude tribes of the Goths and Teutons in the dark ages. She becomes an abject dependent on the will or caprice of her husband, a rival with her children for his favor and support. After spending her life in the faithful discharge of her conjugal duties, she may be turned off in her widowhood and old age to utter destitution. The alteration of the law makes it more incumbent on the court to defend the wife from wrong, as she now has no power to defend herself.

III. Such voluntary conveyances, as are set up by the defendants, would be void as against creditors. Rev. Stat. 262, §1 to 5; ib. 268 and 277. Surely the claim of the wife for a support from *that estate into which* all her earnings and all her property have gone, cannot be deemed less sacred than the demands of ordinary creditors. The spirit of our laws and the provisions of our statutes prefer her claims to those of creditors.

IV. The husband cannot defeat his wife's right of dower by *devise.* 1Rev. Stat. 289. The conveyances by Thayer are in the nature of a testamentary disposition of his property. They were made in *prospect of death* ; they conveyed *all his real and personal property*, reserving the *use to himself for life,* and dividing it *upon his death* among his legal heirs precisely

as the law would have divided it without a will, (except that they defeat the wife's dower,) and they were without valuable consideration. No particular form of words is necessary for a devise. An instrument in any form, if the obvious purpose be that it shall not take place till after the death of the person making it, shall operate as a will. If these conveyances are held valid, the principle that the husband cannot deprive the wife of dower, by will, is virtually annulled. The common form of a will would be changed to the form of a deed, but the substance, that is, the testamentary disposition, would remain. By changing the form, too, the restraints, which are provided by the statute against imposition and fraud upon dying men, will be annulled, and wills that cannot be cancelled, will creep into use.

V. There are several established principles of law which, by analogy, apply to this case; e. g. voluntary conveyances, made by the wife before her marriage, to deprive her husband of her property, and by the husband to deprive the wife of dower, are relieved against in equity. 4 Cr. Dig. 342, 344, § 34 to 42. *Carleton v. Dorset,* 2 Vern. 17. *Pitt v. Hunt,* 1 Vern. 18. *Poulson v. Wellington,* 2 Pr. Wms. 533. *Goddard v. Snow,* 1 Russ. 485. 2 Kent's Com. 174, in note cites 13 Maine R. 134; 1 Meigs' Term R. 142. If made after marriage by the husband, for the same purpose, they are more unjust and fraudulent than if made before marriage. In the latter case the wife may, by inquiry, discover the wrong and protect herself by refusing to marry; but after marriage she has no remedy; she cannot dissolve the marriage; she cannot assume the control of her property, and, without the aid of chancery, she is utterly helpless. The principles, upon which these decisions are made, are exactly the same as those for which the oratrix contends in this case.

2. An assignment of the wife's choses in action by the husband, for a valuable consideration, bars her right of survivorship, but, without such consideration, it does not bar her. 1 Vern. 7. 2 Kent's Com. 137.

3. A collusive judgment against the husband does not prejudice the wife's right of dower, though a recovery by actual title destroys it. 4 Kent's Com. 48. This was the doctrine of common law, and is affirmed by Stat. Westm.

2 chap. 4. The revised statutes of New York declare the same thing and these are doctrines of law merely.

4. It was not necessary at common law for the husband to be seized in deed of the lands to establish dower. Seizin in law was sufficient. 1 Cr. Dig. 122, § 11, ib. 187, § 8.

5. The wife is deemed a purchaser for a valuable consideration and the husband, by a voluntary conveyance before marriage, cannot defeat a wife of her rights. 1 Chan. Cas. 99. Rob. on Conv. 502 cites *Rodger v. Laugham, Kirk v. Clark, East India Co. v. Clavel.*

VI. Courts of equity extend special favor to the rights of married women and often establish their claims and grant the relief when remediless at law. Thus a deed from baron to feme during coverture, though void at law, is valid in equity. Again, chancery will compel the husband to provide for the wife before it will help him reduce her choses in action to possession. 7 J. C. R. 57.

VII. The actual seizin in substance was in Amherst Thayer at his death. He held possession at death and his possession was not by virtue of the lease from Wheelock S. but in his own right. The deed and lease must be construed as one instrument and mean to have and to hold, upon the death of A. Thayer, not before. This would be void at common law, as a freehold to commence *in futuro.*

*Of the personal property.*

I. The conveyances of the personal property were fraudulent and void for the same general reasons which have been assigned as avoiding the deeds of the land.

II. They were also void as being at the most mere gifts, which, without delivery to the donee, are void. The possession of the personal property was all in the husband of the oratrix till his death. There was no delivery to the defendants or any of them. Equity will not give effect to an inchoate and imperfect gift. Amherst Thayer did not part nor intend to part with his dominion over the property. 4 Kent's Com. 438–9. 7 Johns. 26.

III. But the conveyances do not amount to even a mere gift; for Amherst Thayer was to have the use and avails of the property for life, and upon his death the defendants were to have what was left. This is a mere promise to give at death, a promise to make a voluntary gift, and courts of

equity will not carry into effect voluntary agreements or promises that are executory. It will be difficult for the defendants to suggest any very meritorious considerations to help their claims. 18 Johns. 145. *Minturn* v. *Seymour*, 4 J. C. R. 497. 4 K. C. 52. 1 Cr. Dig. 137. *Sidney* v. *Sidney*, 3 Pr. Wms. 269.

Dower may be assigned by a decree of Chancery. In practice it is quite as convenient and cheap as the mode of process at law. 4 K. C. 71. 4 J. C. R. 607.

*H. R. Beardsley*, for defendants.

1. The family settlement made by Amherst Thayer, being based upon the consideration of natural love and affection, is a valid transaction, as between the parties, and will only be set aside in favor of *bona fide* creditors. Roberts on Frauds, 22 to 24.

As it regards the personal property, the transaction was equally valid and binding upon the parties. The fact that the property was to remain in the possession of Amherst Thayer, until his decease, would only be inoperative as against creditors. Roberts on Frauds, 641 to 649. *Ib.* 50 to 54. 16 Johns. R. 189. 7 Johns. R. 161. 1 Root's R. 104. 17 Mass. R. 222. 1 Vern. R. 100.

The wife, at the time of the settlement, had no rights to be affected by it. She was not a creditor, and is never regarded as a creditor to her husband, whatever be the amount of property which he may acquire by the marriage. Mad. Ch. 387, 8. 5 Cond. R. 419.

2. The oratrix claims to set aside this settlement, upon the ground that it was made in fraud of her rights. The determination of this question must depend mainly, if not wholly, upon the legal rights of the oratrix touching her husband's property during coverture. The English rule upon this subject has been abrogated by our statute. Rev. Stat. page 347, § 70, 71.

In order to determine the right of the widow, under our statute, it may be important to consider the object of the statute. It is manifest that the object and intention of the act was, to free property from the incumbrance, which, by the English law, attached upon the marriage.

It was an obstacle, in the way of alienation, extremely burthensome and prejudicial.  The act makes the death of the husband alone, to give birth and life to the right of the wife.

The widow has then, under this act, no right by virtue of the marriage, nor at any time during coverture, to any part of her husband's estate, but it is left free, to be disposed of by sale or otherwise, at his will and pleasure.

This subject was fully examined at law in Connecticut, in the case of *Stewart* v. *Stewart*, 5 Conn. R. 317, upon a state of facts identical with the present, and in that case the court fully sustained the doctrine for which we now contend. This is the only reported case which we have been able to find, bearing directly upon the point in controversy, but it is none the less to be regarded because it stands alone.   The decision is founded in sound sense and reason, and is unquestionably the law on this subject.

In England, and wherever the English rule prevails, the right of the wife originates with the marriage, whereas, in this state and Connecticut, the right has no existence till the decease of the husband, and then attaches only upon the estate of which he died seized.

If the view thus far taken, be correct, the pretended fraud committed by Amherst Thayer, upon the rights of his wife, falls to the ground.   It is an absurdity, a solicism in terms, to talk of fraud upon rights which have no existence. The oratrix, at the time of the settlement made by Amherst Thayer, had no rights to be defrauded.

We have thus far considered the case in its legal aspect, and have treated of the rights of the  oratrix as they exist at law.

3. The next inquiry is, as to the rights of the oratrix in equity.   If she has any right at all, it is a mere equitable one, which a court of equity will recognize, or not, according to the circumstances of the case.   It is not easy to discover what equity is to be derived from the single fact that she was Thayer's wife.   The contract of marriage is equally and mutually beneficial.  What the wife loses, or surrenders, by the marriage, is made up to her by an equivalent, which, by law, the husband is obliged to render.   Hence, no equity can arise from this consideration, which a court of equity will recognize as paramount to all other considerations.

To sustain this claim would be against sound policy. It would be offering an encouragement to the violation of conjugal duty, which equity will not permit. But this view of the subject does not rest alone on general reasoning. It has been adopted and sustained by courts of equity in numerous adjudged cases in matters of equitable consideration, bearing a strong analogy to the present. For instance, when the wife, without cause, deserts her husband, equity will not aid her in enforcing a marriage settlement, or in recovering property settled to her seperate use. Jeremy's Equity Juris. 204. *Lee* v. *Lee.* 1 Dick. R. 321. 2 Ib. 806. 1 Mad. Ch. 391, 392. 4 Ves. 798. *Mildmay* v, *Mildway*, 1 Vern. 52.

So, too, in regard to alimony, it has uniformly been holden, that licentious conduct and misbehaviour of the wife will destroy her claim for alimony. Eg. Dig. 89. *Bedell* v. *Bedell*, 1 Johns. Ch.R. 604. *Watkins* v. *Watkins*, 2 Atk. 96. These cases proceed on the ground that the relation of husband and wife having once subsisted, alone, does not confer upon the wife a sufficient equity to enforce a claim for property against the husband.

4. Again, this subject-matter is regulated by positive statute, and is equally binding upon a court of equity and law. If the oratrix had no right at law, she has none in equity. If she could not, against the act of which she complains, be defended at law, she cannot in equity. Her rights must have a legal existence, to enable her to enforce them in a court of equity. They must exist in fact, not in imagination. If she has no rights to dower by law, except in such property as remains undisposed of by her husband in his life time, or in other words, if she has no vested right in her husband's property during coverture, she has no right in equity, or anywhere else, after his death, to question his alienation of it during life.

Personal property, under our statute, stands substantially upon the same footing as real estate, and yet, was it ever questioned, that the husband might not give every vestige of it to his children during life, and the wife have no right to complain of it.

In New York, personal property, by their statute, (Vol. 1, p. 538, § 15,) is placed upon the same ground, as it regards the right of the widow, that it is under our statute, and yet

it was there adjudged, in chancery, in the case of *Holmes* v. *Holmes*, 3 Paige's Ch. Ch. R. 363, that the husband might make such a disposition of his personal property as he chose, even for the purpose of depriving his wife of any share in it, after his decease, and that he could not thereby commit a fraud upon the rights of his wife. And the reason given is, that she had no rights to be defrauded of. We are unable to discover why that case, if law, is not conclusive of the present. See also, 8 Ves. 62. 1 Pick. 157.

5. But again, there is a class of cases which would seem to show a very marked distinction, recognized in the books, between the marital rights of the husband and those of the wife, and which may be important in the consideration of this case. 2 Hovenden on Frauds, 82. The doctrine deducible from these cases is, that the law conveys marital rights to the husband. For instance, the husband, by marriage, acquires an absolute property in the personal chattels of his wife, the right to control and reduce to possession her choses in action, and the right to the use of her real estate during coverture. Here are certainly very paramount and important rights, and, in view of these rights, courts have holden that, pending a treaty of marriage, if the intended wife makes a voluntary conveyance or settlement of her property upon any person in fraud of these rights, the conveyance or settlement will be set aside. *Carlton* v. *The Earl of Dorset*, 2 Vern. 17. *Goddard* v. *Snow*, 1 Russell's R. 485. These cases are all reasonable and perfectly consistent with our previous view taken of this case.

But while this doctrine is sound in regard to the rights of the husband, it by no means follows that the wife stands upon the same footing; but on the contrary the wife has no such rights, and, of course, none to be affected by any antenuptial act of the husband. Hence it is that, while the books are full of cases in which antenuptial conveyances, made by the intended wife in contemplation of marriage, have been set aside in favor of her husband as a fraud upon his marital rights, not a single English case can be found where a voluntary conveyance, made by the intended husband before marriage, has been set aside as fraudulent upon the wife's right of dower, and the reason is obvious,—this right of the wife is too remote and depends upon too many contingencies

FRANKLIN,
*January,*
1842.

Thayer
*v.*
Thayer *et. al.*

to be affected by any antenuptial act of the husband ; whereas the rights of the husband are immediate and dependent upon no contingency. If this distinction be true, in reference to the English law on the subject of dower, most emphatically ought it to obtain in this state and under our statute in relation to dower. Indeed, this distinction necessarily grows out of the law regulating the relation of husband and wife.

The legal existence of the wife is merged in that of the husband. Most of her rights are either transferred by law to the husband, or extinguished by the marriage. While the husband, by the marriage, acquires rights, she loses the same rights. This consideration furnishes a very strong argument against the claim of the oratrix. Had it even been supposed the intended wife, by entering into a contract to marry, thereby acquired any such right to dower as could be recognized either at law or in equity, cases would have occurred in which conveyances made by the future husband, in contemplation of marriage and for the purpose of defeating dower, would have been made the subject of judicial investigation.

The opinion of the court was delivered by

BENNETT, J.—The question, now presented for the decision of this court, is important in principle, and deeply involves the well-being of, at least, a portion of the community. It is due to the counsel in the cause, that we should say that our investigations have been in no small degree facilitated by their industry, and the ability with which it has been argued.

Though the court are not unanimous in their views, yet a majority of the judges concur in affirming the decree of the chancellor.

What shall be the effect of the conveyance in question upon the rights of widow ? The question is important, and, especially so, as shifts, like the one before us, are easily resorted to with a view to affect the interests of the wife. The wife is not to be barred of her dower, without her consent, by the will of her husband, even, though he has thereby made an ample provision for her support. Her claims to dower are paramount to those of creditors, and it has long since become

a legal maxim, " that dower is a favorite of the law." Sir
John Trevor, Master of the Rolls, in the case of Lady Dudley
and Lord Dudley, Preced. in Chan. 244, calls it " a *legal, an
equitable, and a moral right.*" In Lill. Abri. 666, G. p.
417, it is said ; " it is a right favoured in a high degree, and,
next to life and liberty, held sacred." It is a right which
was instituted for the subsistence of the wife during her life,
and the husband is bound, by the law of God and man, to
provide for her a support during his own life, and, upon his
death, the moral duty does not end. He should provide for
her so long as she lives. In view of the law, relative to hus-
band and wife, this is a most reasonable duty. During cover-
ture the wife can acquire no property of her own, and if,
when married, she has real estate, it thereby vests in the
husband during coverture, and her personal estate in posses-
sion becomes his absolutely, and such as is in action is sub-
ject to his control. If she has no real estate of her own,
she may, by his death, be left the object of common charity,
unless provided for out of the husband's estate. Courts in
ancient and modern times have been astute in protecting the
right of dower, and shall it be said of the courts of this state
that they have been regardless of duty in protecting to the
widow this valuable right, which comes as a substitute, or
compensation, for those which, upon the marriage, she sur-
rendered up ? To hold that the oratrix in this case is barred
of her dower, would be indeed enabling the husband to over-
reach the wisdom of the legislature, when they provided
that this right could not be barred by will. It is admitted,
in the defence, that if the claim of the oratrix to dower can
be recognized as a right, during coverture, it cannot be de-
feated by the family settlement. Though, under our law,
dower is limited to such lands as the husband died *seized of,*
yet, if the right has existed during coverture, then it should
be protected, and a conveyance, *with the intent* to defeat
such right, would be fraudulent and void as against the widow,
and as to her, the husband would die seized. Before mar-
riage, the husband has an inchoate interest in the property
of the wife.

If she, during the treaty for marriage, without the know-
ledge of her intended husband, makes a *voluntary* disposi-
tion of her property, it is a fraud upon his marital rights,

though it be done prior to its celebration, and chancery will, upon his application, set it aside. This is settled law. *Pitt* v. *Hunt*, 1 Vernon, 18. *Carleton & wife* v. *Earl of Dorset*, 2 Vernon, 17. *Howard* v. *Hooker*, 2 Chan. R. 42. *Goddard* v. *Snow*, 1 Russ. R. 42. Clancy on Husband & Wife, 614. Newland, 424. Lord Thurlow, *in the Countess of Strathmore's case* v. *Bowers*, 1 Ves. Jun. 28, says, "the law conveys the *marital rights* to the husband, because it charges him with all the burthens which are the consideration he pays for them, and therefore it is a right upon which fraud may be committed, and out of this right arises the rule of law, that the husband shall not be cheated on account of his consideration." So the right of dower arises from a contract, made upon a *valuable* consideration, marriage being, in its nature, a civil contract, and the rights growing out of it are the consideration moving from each of the contracting parties to the other. This is the doctrine of the Master of the Rolls in the case of *Banks* v. *Sutton*, 2 Pr. Wms. 705, and to me it is most reasonable. The common law doctrine of dower in all the lands of which the husband was seized during coverture, was considered by this, and some of the other states, as an unreasonable and unnecessary clog upon the free alienation of estates, and, as the usual course is for the wife, upon an alienation, to join with the husband in the conveyance, of little practical use. If the husband is required to act in good faith, this change in the law does not essentially impair the rights of the wife for a support during widowhood. If, however, her claims to dower are to depend upon the caprice of the husband, and to be superseded by his conveyance, concocted and executed *mala fide*, and without consideration, our statutory provision might well receive our severest animadversion. As well may the rights of the wife to dower, under our law, be recognized and protected during coverture, as the rights of the husband in the property of the wife before marriage. The one is no more *ideal* than the other. Most certainly the rights of dower, under our law, during coverture, cannot be more fragile than at common law, before the marriage celebration. In *Martins* v. *Bennett*, Bunb. R. 336, a deed, executed in secret, by the son to the father, on the morning of his executing his marriage settlement, was set aside upon the circumstance of secresy alone,

it being in fraud of the marriage agreement. So Lord Ch. B. Gilbert has said that " if a husband, seized in fee of lands, should, immediately before his marriage, vest the legal estate in trustees, to disappoint his intended wife of dower, such a conveyance would be *fraudulent*, being made with an ill conscience, to deprive the widow of the provision made for her by the common law." Gilb. Chan. 267. In *Swain* v. *Perine*, 5 Johns. Ch. R. 489, Chancellor Kent held that a deed, given by the husband, for love and affection, to a daughter, upon the eve of his marriage, and kept secret from the intended wife until after her marriage, was *fraudulent* against her claim to dower. The right of the wife to dower, under our law, in the lifetime of the husband, it will readily be admitted, cannot be less sacred. The case of *Stewart* v. *Stewart*, 5 Conn. has been pressed upon us, but we cannot yield our assent to the authority of that case. The notion that the right of the wife to dower in the husband's lifetime, is a *nonentity*, and not susceptible of fraud being predicated of it, is unsatisfactory, and, we think, unsound, and at war with the principles of justice. Though the right may be inchoate, it should be protected against the *mala fide* acts of the husband.

The statute gives the widow, at least, one-third of the personal estate, after the payment of debts, &c.; and this she cannot be deprived of by the will of her husband, nor by jointure, except at her election. The widow's claims for her share, under our statute, is an analogy to the claim of the widow of a freeman under the custom of London. The statutes of distribution were borrowed from that custom, and hence the decisions under it may well illustrate what should be the course of decision under our statute. The case of *Edmundson* v. *Cox*, 7 Viner's Abri. 202, is an important one, showing the analogy and the grounds upon which courts have proceeded. The bill was by the widow of a freeman of London for her customary share. The husband had made his will and devised to the wife certain real and personal estate. There was, sealed up in the will, the bond of the testator, executed before the date of the will, conditioned to pay the defendant a given sum of money, or transfer to him a given amount of bank stock. The obligee was the nephew of the testator, and the bond *voluntary* and *without*

*valuable consideration.* It was held, by the Master of the Rolls, that the widow, before she could have a decree for her customary share, must first disclaim all benefit under the will, and that the bond, being in the nature of a *voluntary gift*, was *fraudulent* as to the customary share of the wife, and should not stand in her way. He adds, " such sort of *contrivances* to *evade the custom*, have always been set aside in this court." In *City* v. *City*, 2 Lev. 130, the deceased had, by deed, assigned a term to his son as a provision, and the son had gone into possession, and it was held this did not bar the widow of her customary share, the assignment being without consideration, and it was said, " the same is the law as to goods.". In *Smith* v. *Fellows*, 2 Atkins, 62, a *voluntary* deed of a lease-hold estate to a son was set aside, and the widow's customary share decreed to her. The husband, it was said, notwithstanding the deed, was still *seized* of the lease-hold estate, and in the same case, before the Chancellor, 2 Atkins, 377, he says, " it was a plain *fraud upon the custom.*" In *Hall* v. *Hall*, 2 Vernon, 277, it was held that if a freeman gives away goods in his lifetime, and yet retains the deed of gift in his own power, or retains the posession of the goods, or any part of them, it is a fraud upon the *custom*, and will not conclude the widow, and in the case of *Fairebeard* v. *Bowers*, 2 Vernon, 202, a *voluntary* judgment by a freeman of London, payable after his death, was postponed to the widow's claim for her customary share. A *contrivance* to evade the rights of the widow under the statue should not meet with more favor. The custom of London and the statute of distribution are each equally imperative in furnishing a rule of property, and to withdraw a case from their operation, to the injury of the widow, under a contract made *mala fide*, and without consideration, would be a fraud upon the law and upon her rights.

In *Holmes* v. *Holmes*, 3 Paige, 363, the Vice Chancellor held, that a conveyance of personal estate to take effect after the decease of the husband, and made with the *intent* to defeat the widow of her distributory share, under the statute, was a *fraud* upon her. Though this decree was reversed by the Chancellor, yet I think the opinion of the Vice Chancellor the better reason. The Chancellor evidently pro-

ceeds upon the same ground that is assumed by the Connecticut court in the case of *Stewart* v. *Stewart.*

The Chancellor supposes that the wife and the children, both stand upon the same ground, and that neither have any such rights, in the life time of the ancestor, as to be the subject of fraud. But there is a manifest difference. The ancestor may, by will, exclude entirely the children from all participation in his estate; not so the wife. The children are not heirs so long as the ancestor lives, and have no inchoate rights as such. The husband and the wife each acquire their *marital* rights, in one sense, as purchasers, and upon *valuable* consideration. In the language of Sir Joseph Jekyll "the marriage, and its attending rights and disabilities, is a consideration moving from each of the contracting parties to the other." In *Douglass & wife* v. *Ward,* 1 Cases in Chan., it was expressly adjudged that marriage was a good consideration to make the *feme a purchaser.*

But in the case now before us, there was no delivery of personal estate. The contract provides for the distribution of such as should remain and be on hand at the time of the death of the ancestor, and the lease, or demise, (as it is called,) to him, secures him in the possession and use of it during his life. Both contracts being made at the same time are to be regarded as one, and it is expressly provided that the deceased should retain the possession, as well as the use, of the property, and he in no way abridged himself of its control. None was to be distibuted, under the trust conveyance, but such as should be on hand at the time of the death of the ancestor. A gift is not consummated, nor the ownership of the chattel changed, until a delivery. 2 Johns. 52. 7 Johns. 26. 18 Johns. 148.

In a case in 3 Anstr. 882, reported also in a note to 5 Vesey, Jun. 266, the father covenanted upon the marriage of a daughter to leave her, by will, an equal share of his personal estate with her brother and sister. To *elude* this covenant, the father, in his life time, conveyed stocks to his son, *reserving* to himself the *dividend* during his natural life. It was held, in the house of Lords, that as the ancestor reserved in his own hands the stocks, by taking the *dividends* during his life, he was, at the time of his death, the owner of the stocks for all beneficial purposes. The court did not per-

mit the right of the daughter to her testamentary portion, according to the covenant of the ancestor, to be eluded by an act not to take effect against his own interest, but only at a time when it would cease. This is like the case now under consideration.

The position taken by counsel, that the widow is barred of any claim, by reason of her having left her husband before his death, cannot be sustained. It is undoubtedly true that previous to the separation, there had been some family discord ; the deceased had a family of children, grown up, by a former wife, and a part of them living in the same family ; and the oratrix had children by a former marriage, and was a second wife. Under such circumstances, it is not an uncommon thing for jealousies to spring up and end in strife, but it is of no importance to inquire into the merits of the controversy, or who might have been most to blame. The evidence tends to show that the separation was in the end by the mutual consent of husband and wife. Indeed, the consent of the husband seems to be involved in the fact that the small amount of property carried away by the wife, was delivered to her, by the husband, for the specific purpose of carrying away, and was taken with his approbation.

But, be this as it may, there is nothing in the evidence that can bar the widow's rights of dower, or her right to a distributory share. Though the wife might have been indiscreet, and have left the husband without a justifiable cause, still this would not work a forfeiture of her rights.

The conclusion, then, to which we come, is, that the oratrix had, in the life time of her husband, such rights as should be recognized, protected and enforced ; that the attempt to elude these rights, in the manner disclosed in this case, was *mala fide*, and a *fraud* upon the law and upon the marital rights of the oratrix, and that, as a consequence, the husband, so far as respects the widow, must be regarded, at the time of his death, as being the owner and having the *seizin* of the property in question. This result, we think, is in accordance with well settled principles, and such as sound policy and justice dictate.

The decree of the chancellor, then, is affirmed with costs in this court, with this modification, viz : that the time for

the payment of the sums decreed by the chancellor is to be extended to the 15th of June, A. D. 1842, and the cause is remitted to the court of chancery to be proceeded with accordingly.