RICHARD H. HEBB AND OTHERS, EXECUTORS OF JAMES HEBB, *vs.* CATHARINE HEBB, EXECUTRIX OF SAME.— *December,* 1847.

An appeal will not lie from an order of the Orphans court, refusing to revoke letters testamentary.

Where the widow of the deceased claimed certain bonds as donations *mortis causa*, and it did not appear affirmatively to the court at what time they were delivered by the alleged donor to his wife, whether in health, or in his last sickness, it was held she was not entitled to them as donations.

A conversation with a dying party, which may be considered as a narrative by him of what he had done upon a former occasion, is not sufficient to establish a *donatio mortis causa*.

A *donatio mortis causa* must be with a view to the donor's death; it must be conditional, only to take effect by the death of the donor, by his existing disorder. There must be delivery of the subject of donation. These are among the essentials of a valid gift of this description.

APPEAL from the Orphans Court of *St. Mary's* County.

On the 3d May, 1847, the appellants filed their petition, alleging that they apprehend they are likely to suffer by the misconduct of the aforesaid *Catharine*, in the administration of the estate of the aforesaid *James*, and by the improper use and application by her of certain bonds, for the payment of money, to wit: bond of *B. G. Harris*, bond of *Richard Thomas* and of *John Wills*, which said bonds are assets belonging to the estate of the aforesaid *James*, deceased; and they therefore pray for subpoena, &c. And that the said Catharine may shew cause why her letters testamentary shall not be revoked, and the aforesaid bonds delivered over to the complainants, the remaining executors.

The answer of *Catharine Hebb* denied that she has been guilty of any misconduct in the administration of *James Hebb's* estate, on which she and the complainants were appointed by the will of the said *James Hebb* joint executors; and also denies that she wished to make any improper use and application of the bonds alluded to in said petition, or of any portion of the estate of the said *Jas. Hebb;* that the complainants entered into a joint bond, and herself in a separate bond, conditioned for the faithful performance of their duties as executors. As to the bonds alluded to in said petition, this respondent claims them as a " *donatio causa mortis*" from her husband, *James Hebb;* and as the court will recollect, she, herself, voluntarily offered, at a previous meeting of this court, to have the matter tested by your honors. Judgment which was opposed by the complainants themselves who have filed this petition, praying for a revocation of her letters, as if she were guilty of the grossest improprieties as executrix. This she denies, and prays the court to decide on the matter between the parties.

The defendant then proved by a witness, that she, the witness, was at *Mr. Hebb's* the last ten days before he died. He died of the illness with which he was then afflicted. The first of January, 1847, being two days before he died, she talked with the deceased about the bonds in question.

*Mr. Hebb* stated on the night of the first of January last that he did not think all were satisfied with his will, and upon witness asking who he meant, he said his wife. Witness then asked what he had done for his wife. He stated he had left her in his will one-third of his personal property, and one-third of his lands, during her life. She, the witness, then asked what he did with those bonds, (meaning the bonds before the court, as here transcribed.)

1. Bond of *Richard Thomas* for $500, dated 6th May, 1845, payable on demand to *James Hebb, &c.*

2. Bond of *B. G. Harris* and *H. G. S. Key* for $1,000, dated 1st July, 1842, payable to *James Hebb, &c.*

3. Bond of *John B. Wills* for $500, dated 2d June, 1839, payable to *James Hebb, &c.*

Which he always promised to give his wife. *Mr. Hebb* stated that they were his wife's; that he always intended them for her: that he had given them to her, and they were in her possession. Witness then observed that the bonds had been changed, so as to be made payable to him, the said *James Hebb*, and that *that* would deprive her (his wife) of them. *Mr. Hebb* then declared, that as they were changed, he still gave them to his wife, and again said, she, his wife, has them, and no one can take them from her.

Witness further states, upon question by the complainant's counsel, that one of these bonds, to wit: that of *John B. Wills* was taken by *Mr. Hebb* from the obligor after his marriage with *Mrs. Hebb*, for money which was owing from the said *John B. Wills* to *Mrs. Hebb*, for a legacy due to her since her marriage with the said *Mr. Hebb*. That the bond of *Mr. Richard Thomas* was taken by *Mr. Hebb* for money loaned to *Mr. Hewit*, and afterwards to *Mr. Thomas* by *Mr. Hebb;* and that the bond of *Benjamin G. Harris* was taken for a bond, due from *Henry G. S. Key* to *Mr. Hebb*, for money due to *Mrs. Hebb.*

The Orphans court (HEARD, GOUGH and LOKER, Justices) on the 16th June, 1847, decreed that the prayer of the petitioners be rejected; this court being fully satisfied from the

evidence that the bonds referred to in the petition of the complainants were given to respondent by *James Hebb* as a *donatio causa mortis :* and being also fully satisfied that the said *Catharine Hebb* has been guilty of no misconduct, as executrix of *Jas. Hebb*, in making an improper use and application of the said bond. And that complainant's bill be dismissed with costs.

The complainants appealed to this court.

This cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, SPENCE, MAGRUDER and MARTIN, J.

By CAUSIN and DORSEY for the appellants, and

By B. G. HARRIS for the appellee.

MAGRUDER, J., delivered the opinion of this court.

From an order by an Orphans court, refusing to revoke letters testamenty, an appeal will not lie. If, therefore, the record which is before us presented no other question, the appeal would be dismissed. But the Orphans court, in this case, was called upon to decide another question.

The appellants are two of the executors of *James Hebb :* the appellee is the other. The appellants, by their petition, asked the Orphans court of *St. Mary's* county to revoke the authority granted to the appellee, upon the ground of misconduct by the latter; and this misconduct, it appears, consisted in withholding certain obligations which the testator held in his life-time, and which, it was insisted, was a part of his estate, to be administered by his executors. The appellee, in her answer, admits the obligations to be in her possession, and insists, that she claims them, and is entitled to claim them, as a *donatio mortis causa.* The court, upon the proof offered, decided that her title to the obligations was well founded, and this part of the decree is now the subject of review.

A *donatio mortis causa* is stated in *Matthews' Practical Guide to Executors and Administrators* to be, where one in his last illness, and apprehensive of the approach of death, delivers or causes to be delivered, to or for a party, the possession of any of his personal effects, to keep in the event of his death: and

such gift is always accompanied with an implied trust, that if the donor live, it shall revert to him.   A party's wife is capable of such gift.   *Preston*, in his *Treatise on Legacies*, stating the law of donations of this description (ch. 9) says, " they are an irregular kind of bequest, being a gift *inter vivos*, to be perfected *post mortem*."

There exist very serious objections to dispositions of this kind.   This court, in the case of *Bradley & wife*, complainants, against *Hunt, admx. of Jack. 5 G. & J.* 56, urging the necessity of a strict adherence to the rule, that a delivery of the thing intended to be given, is essential to the perfection of the gift, and said : " if we were at liberty to do so, we should not so be disposed to relax the rule, which would be to open still wider, the door already sufficiently wide, to frauds and perjuries, and the exercise of undue influence by the artful and designing upon the weak and unwary."   Other reasons may be urged why strict proof should be required in order to support such a donation.   Gifts of this description are in every respect as objectionable as nuncupative wills.   In speaking of the latter, the then Chancellor of *New York*, pronouncing the judgment of the Court of Errors, said (20 *John.* 5, 16,) " the title of the legatee depends altogether upon the precipitate death of the testator.   Every day that his life is prolonged more and more impairs the character of the will ; and it vanishes if he becomes convalescent.   The legacy operates as a bounty upon his death.   It becomes the interest of the legatee that the parties sickness should prove to be his *last* sickness ; for if he recovers, the will, of course, falls to the ground."

And what is the testimony upon which the appellee relies to establish the title, which she sets up to the obligations spoken of in the proceedings in this case?   But a single witness is produced, and from her, we get all that we are permitted to know of the testator, his illness, and declarations, and under what circumstances those declarations were made.   By this witness, we are told, that she was at *Mr. Hebb's* the last ten days before he died.   He died of the illness with which he was then afflicted.   The first of January, 1847, being two days before

he died, *she talked with Hebb*, the deceased, about the bonds in question. *Mr. Hebb* stated on the night of the first of January, that he did not think all were satisfied with his will; and upon being asked who was not? said his wife. Witness then asked what he had done for his wife. He stated that he had left her in his will one-third of his personal property, and one-third of his lands during her life. The witness then asked what he did with those bonds? (the witness states, that she meant the bonds now claimed by the appellants) *which he always promised to give his wife?* *Mr. Hebb* stated that they were his wife's: that he always intended them for her; that he had given them to her, and they were in her possession. Whereupon, the witness observed, that they had been changed so as to be made payable to him, *James Hebb;* and that would deprive his wife of them. *Hebb* then observed, that as they were changed, he still gave them to his wife, and again said, his wife has them, and none can take them from her. This then was the conversation between *Mr. Hebb* and the only witness in the case, in regard to the bonds now claimed as a *donatio mortis causa.* Without remarking particularly upon this testimony, it is obvious that we are furnished in it with no very conclusive evidence that the deceased ever intended to make a *donatio mortis causa* of those bonds. Indeed, this whole conversation may be considered a narrative of what the deceased had done at some former, and it may be, distant period.

These obligations had been put into the wife's possession; but when? It may have been long before the illness of which he died, and before the execution of the will, which it appears that he made. He, it is supposed, always intended them for her, and yet did not give them to her by will.

A gift of this description must be with a view to the donor's death; it must be conditional—only to take effect by the death of the donor, by his existing disorder. There must be delivery of the subject of donation. *Williams on Executors*, 498.

These are among the essentials to a valid gift of this description, and of their existence in this case, the record does not furnish the necessary proof. All that the deceased is made to

say, is in answer to enquiries made of him, and information given to him by a person who is to be considered a stranger to the transaction.

The subject of the gift is to be delivered to or for the donor, to be kept in the event of his decease. If he live, the property is to revert to the donor. *Toller on Executors*, 233. Of such a gift, we hear nothing in the testimony. The deceased is made to declare that the obligations belong to his wife, none can (of course he himself could not) take them from her. The property is to be delivered in his last illness, and when apprehensive of the approach of death. At what time these obligations were delivered, and whether at that time he was not in perfect health, the record does not enable us to ascertain. We cannot decide that according to the proof the deceased delivered to or for his wife, these obligations, when he was in extremity, or was surprised by sickness, not having an opportunity of making his will.

We discover in the matter set forth in the petition, no ground for a revocation of letters testamentary; but the decree, so far as it declares that the bonds referred to in the petition of the complainants were given to the respondent, by *James Hebb*, as a *donatio mortis causa* must be reversed.

DECREE REVERSED WITH COSTS.