## HATCHER v. BUFORD.

### Opinion delivered January 12, 1895.

1. *Gift—Delivery.*

   To constitute a valid gift it is essential that there be a delivery.

2. *Gift—When* inter vivos.

   One who was in contemplation of death, but able to drive around and attend to his business affairs, transferred to his nephew an interest in his mercantile business, took his note therefor, and transferred the note to the nephew's mother, with the intent to make an absolute gift to the nephew of an interest in his business. *Held*, that the transfer was a gift *inter vivos*, and not *mortis causa*.

3. *Gift—When* mortis causa.

   Deceased, while on his deathbed and unable to transact any business, directed his agent to buy bank stock in the name of his sister, and to transfer it to her, which was done. There was nothing to rebut the presumption that it was a gift *causa mortis*. *Held*, that the delivery of stock was a gift *causa mortis*.

4. *Dower—Gift* mortis causa.

   Under Sand. & H. Dig., sec. 2541, providing, in substance, that a widow shall be entitled, as part of her dower, to one-third of the personal estate "whereof the husband dies seized or possessed," property conveyed by a husband by gift *causa mortis* is subject to the widow's right of dower.

5. *Dower—Not a vested estate.*

A widow is dowable according to the law in force at her husband's death, and not according to that in force at the time of her marriage.

Appeal from Saint Francis Circuit Court.

GRANT GREEN, JR., Judge.

*N. W. Norton*, for appellant.

"Where a husband, just prior to his death, and in anticipation of death, gives his personalty away, for the purpose of depriving his wife of her dower therein, she is not bound thereby, any more than she would have been by a formal will making the same disposition of it." 23 Atl. 82; 14 Vt. 107; 39 Am. Dec. 211, and note on p. 118 and cases cited; *Ib.* 505; 35 Mich. 415; 8 Atl. 744; 85 Ky. 20; 2 S. W. 545; Mansf. Dig. sec. 2586; 5 Ark. 608; Anderson's Dec. p. 377, title, "Donatio"; 2 Brad. 432; 34 N. E. 166.

*John Gatling* and *Rose, Hemingway & Rose* for appellees.

1. A widow, at common law, was never endowed of personalty. That is a creation of statute, and by its terms it must be admeasured. Mansf. Dig. sec. 2591. She can only demand dower in the personalty of which her husband *died seized.* She has no inchoate dower in personalty. No gift made during life can be a fraud on her rights. 32 Ark. 444; 51 *id.* 45; 55 *id.* 236; 10 Sm. & M. 394; 5 Munf. 42; Am. & Eng. Enc. Law, p. 849; 3 Paige, 363; 11 Humph. 429; 4 B. Mon. 501; 78 Ill. 16; 3 Md. Chy. 141; 5 Conn. 317; 39 Am. Dec. 219, and note.

2. A widow is only entitled to be endowed according to and under the law as it existed at the time of her marriage, and not that at the time of his death. Dower attaches upon marriage and seizure. 5 Ark. 611; 8 *id.* 40; 31 *id.* 579; 35 Ill. 371; 77 Mo. 578; 8 N. C. 281; 6 McLean, 428; 2 N. Y. 250; 21 Ga. 172; 38 Ark. 91–96;

39 *id*. 434; 47 *id*. 237; 50 *id*. 356; 66 N. C. 172; 81 N. C. 270; *Ib*. 219; 18 Mo. 522. Statutes are not construed retrospectively. 14 Ark. 464; 5 *id*. 510; 6 *id*. 493; 10 *id*. 514; 20 S. W. 600.

*N. W. Norton* in reply.

1. Dower is fixed by the law in force at the husband's death. 52 Ark. 7; 53 *id*. 281; 55 *id*. 235; 19 S. W. 498; Wade's Retroactive Laws, sec. 181.

2. A *donatio causa mortis* cannot deprive the widow of her dower. 2 Bradf. 432; Roper, Leg. 2, 23; 107 U. S. 602; 23 Atl. 82.

WOOD, J. T. A. Hatcher, a prosperous merchant of Forrest City, Ark., died December 10, 1891. He had never had any children, but left a widow, M. E. Hatcher, the appellant. About two months prior to his death, he sold an interest in his store to Walter Buford, his nephew, taking in payment therefor notes of the said Walter amounting to twenty-five hundred dollars. These notes Hatcher indorsed to his sister, Mrs. A. B. Buford, and mailed them to her on the 9th of October, 1891. About one month before his death, Hatcher directed his agent to buy four thousand dollars of bank stock, and, about ten days before, one thousand more. This stock was issued in the name of Mrs. Buford, and was delivered by Hatcher's agent to her son Walter. Hatcher made a will, in which, among other bequests, was a provision for his wife, and Mrs. Buford was declared residuary legatee and devisee.

Appellant's bill (omitting non-essentials) sets up a renunciation of the will, and that the disposition of the notes and bank stock in the manner indicated was done with intent to defeat appellant's dower, and was fraudulent; that the lands of which her husband died seized were a new acquisition. She prays to be endowed of half the notes and bank stock, also of half the fee in the

real estate. The answer denied the fraud, claimed an absolute gift of the personalty, and that dower in the realty should be of one-half for life. The decree refused dower in the notes and bank stock, but granted it in one-half the real estate in fee. Both parties have appealed, and the issues presented by this record are:

First. *Was there a gift?*

Second. *If a gift, was it* inter vivos *or* causa mortis?

Third. *If a gift* causa mortis, *did it defeat the widow's dower?*

Fourth. *Should dower in the realty be according to the law at the time of the marriage, or at the death of the husband?*

**1. Delivery essential to a gift.**

1. *Was there a gift?*

The only controversy on this point was as to the delivery. Delivery, of course, is essential to a gift. 3 Pom. Eq. Jur. sec. 1150; *Ammon* v. *Martin*, 59 Ark. 191. Mrs. Buford testified that the bank stock was not delivered to her until after her brother's death, while Walter, her son, testified that he delivered the bank stock to his mother before Hatcher's death. No question is raised as to the delivery of the notes.

The evidence supports the finding of the chancellor that there was a gift of the bank stock and notes.

**2. When gift is *inter vivos*.**

2. *Was the gift* inter vivos *or* causa mortis?

The *donatio inter vivos*, as its name imports, is a gift between the living. It is perfected and becomes absolute during the life of the parties. The *donatio causa mortis*, literally, "is a gift in view of death." But this does not give us an adequate conception of the gift, as it is understood and treated by the authorities. We find from an examination of these that where one, in anticipation of death from a severe illness then afflicting him, or from some imminent peril to his life, to which he expects to be exposed, makes a gift accompanied by

the delivery of the thing given, either actual or symbolic, which is accepted by the donee, the law denominates such a gift a *"donatio causa mortis."* 3 Pom. Eq. Jur. sec. 1146 *et seq.*; 3 Redfield on Wills, 322; sec. 42 *et seq.*; 2 Beach, Eq. Jur. 1144, sec. 1062; 1 Woerner on Adm. secs. 57, 58; Thornton, Gifts, p. 12, c. 1; 1 Williams, Ex. 844; *Gourley* v. *Linsenbigler*, 51 Pa. St. 345; 2 Kent, 444; 2 Bl. Com. 514; *Hebb* v. *Hebb*, 5 Gill, 506; Schouler on Pers. Property, sec. 135. Were the notes and bank stock in controversy given under such circumstances? Both the pleadings and the proof settle conclusively that the gifts were in contemplation of the near approach of death from the illness then afflicting the donor, Hatcher, to-wit: consumption. The gifts having been made during the last illness, and when all hope of recovery was gone, the presumption is they were *causa mortis*. *Merchant* v. *Merchant*, 2 Bradf. Sur. 432; 3 Pom. Eq. Jur. sec. 1146, *supra; Lawson* v. *Lawson*, 1 P. Wms. 441; *Henschel* v. *Maurer*, 69 Wis. 576. The conditions inhering in a gift made under such circumstances do not have to be expressed. The law attaches them as a part of the essential nature of a gift *causa mortis*. 2 Beach, Eq. Jur. sec. 1063; *Williams* v. *Guile*, 117 N. Y. 343; *Grymes* v. *Hone*, 49 N. Y. 17; *Emery* v. *Clough*, 63 N. H. 552. But it must not be forgotten that an absolute gift—one *inter vivos*—may be made by one upon his death-bed, and who is aware of the near approach of death from his then ailment. Thornton, Gifts, sec. 21, p. 24, and authorities cited.

Is there anything in the proof to overcome the presumption of a gift *causa mortis?* As to the notes, the testimony shows that Hatcher was up and at his store on the day these were executed, that they were delivered on the same day, and that the donor was able to drive out after this transaction. It also shows that it was Hatcher's desire to give to his nephew, Walter Buford,

an interest in the store, and that Walter declined to take it. The notes were executed for this interest, and immediately indorsed by the payee, the donor, to the donee, the mother of the maker of the notes. The gift to his nephew of an interest in his mercantile business seems to have been the real purpose of the donor. Such a gift, of course, would have been incompatible with the limitations which the law imposes upon the use and enjoyment of the subject matter of gifts *causa mortis*, and the attribute of revocability attaching to such gifts. 2 Beach, Eq. Jur. sec. 1063; Redfield on Wills, 322–343. We think the time and circumstances of the gift of the notes, as indicated by the proof, support the chancellor's finding that this was a gift *inter vivos*.

**3. When *causa mortis*.** The same, however, cannot be said of the bank stock. Hatcher was upon his death-bed, and unable to attend to any business when this was given. Four thousand dollars worth of stock were taken out about one month before his death, and one thousand only about ten days before. It was not delivered until a few nights before his death. We find nothing whatever in the proof to take the bank stock out of the presumption that it was a gift *causa mortis*, and nothing to support the chancellor's conclusion as to this.

**4. Gifts *causa mortis* subject to dower.** 3. *Being a gift* causa mortis, *did it defeat the widow's dower?*

Section 2541, Sand. & H. Dig., provides: "A widow shall be entitled, as a part of her dower, absolutely and in her own right to one-third part of the personal estate, including cash on hand, bonds, bills, notes, book accounts and evidences of debt whereof the husband died seized or possessed." Was the donor seized or possessed of the bank stock at the time of his death? The terms "seized" or "possessed," as thus used with reference to personalty, mean simply ownership, which carries with it the actual possession, or a right to the immediate

possession. The real inquiry then is, as to when the title or property in the subject matter of a *donatio causa mortis* passes. We are aware that there is conflict and confusion in the authorities upon this point, doubtless growing out of the modes of *donatio causa mortis* recognized originally by the Roman jurisprudence, whence the doctrine is derived. Under one of these, the subject matter of the gift became at once the property of the donee, but on condition that he should return it to the donor in the event of his recovery. Under another, the gift was made upon condition that the thing given should become the property of the donee only in the event of the donor's death. Under the former, delivery was essential; under the latter, it was not. Thornton on Gifts, 44; *Ward* v. *Turner*, 2 Ves. Sr. 431; Abbott Desc., Wills and Adv. 169.

Mr. Roper, in his work on Legacies, tells us that, after the contest upon the subject had subsided, Justinian gives a definition of *donatio causa mortis*, which alone is the proper one. 1 Rop. on Leg. 1. Mr. Pomeroy quotes this definition and translates it as follows: "A *donatio causa mortis* is that which is made in expectation of death; as when any thing is so given that, if any fatal accident befalls the donor, the person to whom it is given shall have it as his own; but if the donor should survive, or if he should repent of having made the gift, or if the person to whom it has been given should die before the donor, then the donor shall receive back the thing given." 3 Pom. Eq. Jur. sec. 1146. Judge Redfield, in his work on Wills, says: "The conclusion of Justinian's definition seems to embrace the essentials of the gift, viz: the gift is such that the donor prefers himself to retain dominion over it rather than have the donee acquire it. But he prefers the donee should have it rather than his heir." 3 Redfield on Wills, 322.

Those authorities. which hold that the property in the thing given passes upon delivery and during the life of the donor have obviously followed the kind of *donatio causa mortis* referred to *supra*, existing under the Roman law prior to Justinian's definition, which recognized the subject matter of the gift as becoming at once the property of the donee, defeasible upon a condition subsequent, and under which delivery was essential. This is a formidable position, and supported by high authority. *Basket* v. *Hassell*, 107 U. S. 602; *Chase* v. *Redding*, 13 Gray, 418; *Marshall* v. *Berry*, 13 Allen, 43; Thornton on Gifts, sec. 46; *Nicholas* v. *Adams*, 2 Whart. (Pa.) 17; *Daniel* v. *Smith*, 64 Cal. 346; *Emery* v. *Clough*, 63 N. H. 552; Schouler, Pers. Property, sec. 137; *Dole* v. *Lincoln*, 31 Maine, 422.

Since the decision of Lord Hardwicke in *Ward* v. *Turner*, 2 Ves. Sr. *supra*, it has been the settled law of England that delivery is essential in gifts *causa mortis*. And there has never been any controversy upon that point in this country. As delivery is an essential element to complete the transfer of title or property in personalty (Schouler on Pers. Property, sec. 87), the authorities holding to the view that the title passes, and becomes vested in the subject matter of a *donatio causa mortis* during the life of the donor, are dominated by the idea of delivery. But, while delivery is a prerequisite to the transfer of title, it does not follow that there is always a transfer of title where there is a delivery, nor that the delivery of the chattel and the transfer of the title are co-eval in cases where the title is transferred.

We think the better doctrine upon the transfer of the title to gifts *causa mortis* is that which accords with Justinian's definition, and recognizes the subject-matter of the gift as becoming the property of the donee in the event of the donor's death, *i. e.*, the donor's death is a

condition precedent to the vesting of the title to the thing given in the donee. This seems to be the rule adopted by the English courts of chancery, and is supported also by eminent American courts and text writers. 1 Williams, Ex'rs. 782; 3 Pom. Eq. Jur. sec. 1146; *Baker* v. *Smith*, 23 Atl. 82; *Merchant* v. *Merchant*, 2 Brad. Sur. 432; *Gardner* v. *Parker*, 3 Madd. 102; *Edwards* v. *Jones*, 1 Mylne & Craig, 226; *Staniland* v. *Willott*, 3 Macn. & G. 664; *Wells* v. *Tucker*, 3 Bin. 370. This view is certainly more consonant with the conditions which all the authorities agree attach to gifts of this kind, viz., that the reclamation of the donor, or his recovery from existing illness, or escape from peril apprehended, or the death of the donee before that of the donor, will each, *ipso facto*, revoke the gift. *Conser* v. *Snowden*, 39 Am. Rep. 368; *Merchant* v. *Merchant, supra.*

This doctrine we have already approved in *Ammon* v. *Martin*, 59 Ark. 191, where, in speaking of *donatio causa mortis*, we said: "The title to the thing given remains in the donor, and the gift is subject to revocation at any time prior to his death." True, we also said in this case, with reference to the delivery of a note by the donor, while on her death-bed, to the agent of the donee, that "this was sufficient to make the gift complete, no matter what was its character." But this latter statement was made solely in regard to the delivery. It might be construed, however, as applying to the gift as a whole, and not simply to the element of delivery. In that view the language would be inaccurate. In *Ammon* v. *Martin, supra,* it was not necessary for us to distinguish between gifts *inter vivos* and *causa mortis*, the only question there being, *was there a gift?*

But it may be said that this view abolishes all distinction between gifts *causa mortis* and testamentary dispositions, since the *donatio causa mortis* is wholly

inchoate and conditional, not passing title until the donor's death. Many authorities do speak of the *donatio causa mortis* as but another form of testamentary disposition, and liken it unto the testamentary disposition, for the reason that it is revocable during the donor's life, is subject to his debts if there be a deficiency of assets, and does not become an absolute gift until the donor's death. *Jones* v. *Brown*, 34 N. H. 439; *Baker* v. *Smith*, 23 Atl. 82; 2 Kent's Com. 445; Schouler on Pers. Prop. 138. But while, in these particulars, it resembles a testamentary disposition, it differs from it in that the subject matter of the gift is delivered to the donee during the life of the donor, and at his death does not pass into the hands of the executor or administrator, but remains with the donee. This is not because the property or title has passed to the donee during the life of the donor, or that the donor is not actually seized in law at the time of his death, but because it is one of the peculiar characteristics of this species of gift that, at the donor's death, the donee takes instead of the heir, according to the intention of the donor, as manifested during his life by delivery to the donee.

It should be observed in this connection that, of the cases cited *supra* holding to the view that title vested in the donee during the life of the donor, *Chase* v. *Redding*, 13 Gray, 418, was the only one in which the widow was a party; but *Marshall* v. *Berry*, 13 Allen, 43, stands on a parity with it by analogy, and the Supreme Court of Massachusetts is undoubtedly committed to the doctrine that *donationes causa mortis* are valid against the rights of the widow. But the dower rights of the widow rest on a different basis from that of a child or heir. *Thayer* v. *Thayer*, 14 Vt. 107, and authorities there cited. Hence it may be questioned as to whether any case is an authority against the dower rights of the widow where she is not a party, although holding that title vests in the

donee during the life of the donor. For instance, in
*Emery* v. *Clough*, 63 N. H. 552, the Supreme Court of
New Hampshire maintains, as strongly as in any of the
cases, that title to the subject-matter of a gift *causa
mortis* passes during the life of the donor. But in the
case of *Baker* v. *Smith*, 23 Atl. 82, a much later case,
the question being whether a married woman could de-
prive her husband of his statutory distributive share of
her personal estate by a gift *causa mortis*, the same
court said: "What she can not do in this respect by
will, she can not do by another form of testamentary
disposition, which is of the nature of a legacy, and be-
comes a valid gift only upon the decease of the donor."
So also Mr. Schouler, who, in his work on Personal
Property, contends that the better doctrine is the one
which treats the title as vesting upon delivery during
the donor's life, yet, in his work on Wills, maintains that
"the same principles which regulate the wife's testa-
mentary disposition of her personal property should like-
wise regulate her gift *causa mortis*." Schouler on Wills,
sec. 63; on Pers. Property, sec. 137. And the same
author, in commenting upon *Marshall* v. *Berry*, 13 Allen,
43, after saying, "This decision is to be regretted," con-
tinues: "The implied conditions of revocation which
accompany such gifts make the disposition so nearly
ambulatory, like that of a will, that the policy of the
law should not differ in the two cases, except to discoun-
tenance such gifts as much as possible." Schouler on
Wills, sec. 63.

Judge Redfield, upon this subject, says: "It seems
questionable whether a man of substance can be allowed
to dispose of his whole estate, and leave his widow a
beggar, by means of this species of gift, which is clearly
of a testamentary character, where the statute expressly
provides that the widow may waive the provisions of the
will, and come in for her share of the personal estate

under the statute by way of distribution." And he adds: "It is possible the American courts have felt too reluctant to recognize the difference in this respect between the widow and next of kin." 3 Redf. on Wills, 324, note.

Under our law a man may deprive his children of their inheritance by his will, if he names them. So also he may deprive them by a *donatio causa mortis*. But he cannot deprive the widow of her dower rights by either. And this for the reason in both instances that he dies "seized" or "possessed" of the property so conveyed. This, in our opinion, is the only consistent and logical conclusion; for, if the title passes during the donor's life, and he has the absolute right to dispose of his personalty as he pleases, which he has, how can it be said that the donee's rights are inferior to those of the widow, except upon the doctrine above enunciated?

This conclusion makes it unnecessary for us to pass upon the question of fraud, though many courts, of high authority, announce that fraud may be predicated upon such a transaction as this record discloses. *Manikee* v. *Beard*, 85 Ky. 20; *Davis* v. *Davis*, 5 Mo. 183; *Stone* v. *Stone*, 18 Mo. 389; *Tucker* v. *Tucker*, 29 Mo. 350; *Straat* v. *O'Neil*, 84 Mo. 68; *Thayer* v. *Thayer*, 14 Vt. 107. However, the majority of us are not satisfied with their reasoning or their conclusions. *Lines* v. *Lines*, 142 Pa. St. 149; *Pringle* v. *Pringle*, 59 Pa. St. 281, *contra*.

**5. Dower not a vested estate.** 4. The fourth and last question: "*Is the widow endowed according to the law at the time of marriage or at the death of her husband?*" is easy of solution, especially in view of the comparatively recent deliverances of our own court. In *Smith* v. *Howell*, 53 Ark. 279, the court said: "The inchoate right of dower during the life time of the husband is not an estate in land—it is not even a vested right, but 'a mere intangible, inchoate, contingent expectancy.' The law regards it as an

incumbrance on the husband's title. * * * She joins (with her husband), not to alienate any estate, but to release a future contingent right." See also *Hewitt* v. *Cox*, 55 Ark. 235, where same language is quoted.

In *Littell* v. *Jones*, 56 Ark. 139, the court, through Judge Hemingway, again said: "Persons who would be entitled to inherit under existing laws may suffer detriment by changes in the law that alter the course of devolution; but there is no such thing as a vested right in a prospective heirship, or in the maintenance of the laws of descent, and though their change disappoint reasonable expectations, it comes within no constitutional inhibition." See also *Gregley* v. *Jackson*, 38 Ark. 492. Nothing more need be said. It is not true, as contended by counsel, that the wife acquired a vested remainder in the real estate of which her husband was seized during coverture. The argument of counsel for residuary devisee being founded upon a false premise, however plausible and strong, must inevitably lead to an erroneous conclusion. Those of our decisions which mention dower as a vested right only used the term "vested" in the sense of assuring whatever right the law gave, and not in the sense that dower rights could not be affected or changed by a change in the law itself.*

It follows that the devisee, Mrs. Buford, could only claim under the law as it was at the death of Hatcher.

The decree of the chancellor is affirmed as to the notes and real estate. As to the bank stock, it is reversed, and the cause is remanded, with directions to enter a decree conforming to this opinion.

* NOTE.—As to the power of the legislature to change the law relating to dower, curtesy and similar estates, see note to *McNeer* v. *McNeer*, 19 L. R. A. 256.—[Rep.]