## McKEE v. HENDRICKS.

### Opinion delivered July 14, 1924.

1. FRAUDULENT CONVEYANCES—RIGHT OF GRANTOR'S HEIRS AND CREDITORS TO SET ASIDE.—Intestate's mortgages to an innocent purchaser and conveyances of land to a friend, neither piece of property being required to pay his debts, *held* not subject to be set aside at suit of heirs and creditors, under Crawford & Moses' Dig., § 70, as made to hinder and delay creditors.

2. FRAUDULENT CONVEYANCES—RIGHT TO SET ASIDE.—In a suit by heirs and creditors of an intestate, to set aside an alleged gift of a certificate of deposit, testimony as to intestate's acts of dominion over the certificate after delivery thereof *held* to show that the transfer was intended to hinder and delay creditors and not to pass title.

3. EVIDENCE—STATEMENT OF DONOR.—In a suit by heirs and creditors to set aside an alleged gift by intestate of a certificate of deposit, a *prima facie* showing being made of a conspiracy to hinder and delay creditors, testimony of intestate's sister and brother as to his statements to them after the gift was completed *held* admissible.

4. EVIDENCE—SHOWING OF CONSPIRACY.—Evidence *held* to make a *prima facie* showing of a conspiracy in regard to a gift made to hinder and delay creditors, so as to render statements of the donor admissible against the donee.

5. GIFTS—INTENT TO PASS TITLE.—While it is essential that possession be delivered in a gift, mere delivery without an intent to pass title is insufficient to complete a gift.

Appeal from Howard Chancery Court; *C. E. Johnson,* Chancellor; reversed.

*DuLaney & Steel,* and *Will Steel,* for appellants.

1. This suit is brought under C. & M. Digest, § 70, and, as to the creditors, also under §§ 4874 and 4876, *Id.* The mortgage was a fraudulent conveyance, under the first named statute. The term "or otherwise" used therein, is sufficiently broad to include a fraudulent con-

veyance by mortgage. The court will look to the substance of the transaction rather than to the form, and will not permit that to be done indirectly which it would declare void if done directly. 52 Ark. 43; 106 Ark. 411; 136 Ark. 56. A subsequent grantee with notice of fraud stands in the attitude of the original grantee. 55 Ark. 116; 57 Ark. 573; 113 Ark. 101. The burden of proof is on the grantee to show sufficient property retained to pay debts. 55 Ark. 59. And a voluntary conveyance by one in debt is *prima facie* fraudulent. 91 Ark. 394; 124 Ark. 74. A gift to one occupying confidential relations will be scrutinized with the most jealous care (40 Ark. 28), and the evidence to establish such a gift must be clear and convincing. 93 Ark. 548. Evidence as to subsequent possession and acts of ownership on the part of the vendor or donor is admissible on the point whether or not the gift was made. 10 Ark. 211. Likewise, prior and subsequent declarations of the donor are admissible on that issue. 14 Ark. 505; 50 Ark. 283; 15 Ark. 246; 59 Ark. 303.

2. The delivery of the certificate of deposit, if made, was not a gift. The burden of proof was on the defendant to show that a gift in fact was made. 142 Ark. 308. As to the conveyance of the fifteen acres to Hendricks without consideration, the presumption, in the absence of evidence, is that he now holds as trustee for the heirs. And the preponderance of the evidence shows that in putting the money in the bank at Hope in the name of John B. Hendricks, it was the purpose of Lou Jones to use him merely as his bailee, and at all times thereafter to control the title and use of the money. The decision in *Moore* v. *Waldstein*, 74 Ark. 275, indicates that the purpose of the act of 1895 is to cover not only the immediate grant, but also those holding under the original grantee, and that, so long as one takes with notice of the fraud, the remedy is provided against such person. The mortgage was executed with intent to delay creditors, and, so long as the funds can be traced in to the hands of holders with notice, the heirs, in the name

of the administrator, can recover it. Hendricks, in the beginning, was clearly the bailee for Lou Jones. That relation, once having been shown to exist, is presumed to continue. 22 Ark. 466. See also 93 Ark. 548; 13 S. W. 1101; 107 Ark. 581; 12 R. C. L. 469; *Id.* 470; 52 Ark. 459. Under these authorities, since the grantee in the mortgage was an innocent taker, · the loan, which was the property in a changed form, stood in substitution for the property fraudulently conveyed.

3. The execution by Lou Jones of the $12,000 mortgage was the first step in conveying lands with intent to delay creditors. 12 R. C. L. 477.

*O. A. Graves* and *W. P. Feazel,* for appellee.

1. There was no fraud in the mortgage. There can be no fraud in the transfer of property if, at the time of the transfer, the grantor retains sufficient property to pay all his debts then existing. 8 Ark. 470; 29 Ark. 407. The contention that the mortgage was executed with a fraudulent design is inconsistent with the proof of the value of the farm mortgaged, which is shown by their own witnesses to be worth much less than the sum secured by Jones on the mortgage. The substitution of one asset for another as valuable by an insolvent debtor cannot prejudice or defraud the creditors, and is not a fraud upon them. 132 Ark. 268. Section 70, C. & M. Digest, relied on as authority for the administrator and heirs to bring suit, is in derogation of the common law, and should be strictly construed. It has been construed as conferring no right upon an administrator to bring suit for the benefit of heirs of a fraudulent grantor of personal property. 77 Ark. 60. If a creditor has not been injured or damaged by an alleged fraudulent transaction, he cannot complain. 30 Ind. App. 73, 63 N. E. 881. See also 31 Ark. 554; 20 Cyc. 413; 18 Ark. 172.

2. Under the authorities above cited, there was no fraud in the gift of the $9,500 by Lou Jones to Hendricks.

3. The creditors are not sincere in this case. It is apparent by the record that they have entered into an

alliance with the administrator and heirs for the use of their names and their rights to thwart a disposition by Jones of his own property in the manner in which he desired it to go, and to divert it to uses that he tried to hedge against in his lifetime. They have no right, either in law or in equity, under the guise of enforcing their rights, to divert property to other uses than the payment of debts. 20 Cyc. 718; 19 Ga. 401.

4. There was a completed gift to Hendricks. When Jones deposited the $9,500 in the bank at Hope in the name of John B. Hendricks, and gave him the certificate of deposit, the title to said money by that transaction passed out of Jones and vested in Hendricks. 79 Ark. 24; 43 Ark. 318; 93 Ark. 562; 59 Ark. 191; 152 Ark. 343; 155 Ark. 593.

5. If the gifts were invalid as to creditors, they should not be disturbed except in so far as to protect them. 20 Cyc. 617, par. IV; 20 *Id.* 819; 59 N. W. 977; 66 S. W. 790; 74 Tex. 28; 109 Cal. 662; 118 Iowa, 238; 38 Barb. 302; 40 N. C. 47; 5 Fed. 752.

Smith, J. This suit was instituted in the chancery court of Howard County by the creditors and heirs of L. H. P. Jones and the administrator of his estate, for the benefit of the creditors and the heirs, to recover certain lands and the proceeds derived from the mortgage of others alleged to have been conveyed and mortgaged for the purpose of hindering and delaying his creditors in the collection of their just demands. The suit was instituted under § 70, C. & M. Digest.

There was an amendment to the complaint alleging that there was never a completed delivery of the $9,500 hereinafter referred to, and that the possession thereof by appellee Hendricks was that of a mere bailee.

The intestate, Jones, referred to by the witnesses as Lou Jones, owned a farm of 600 acres, and he also owned a 15-acre tract of land and two lots in the town of Mineral Springs. In addition, he owned certain personal property, which the inventory of the administrator of his estate showed to be worth $1,300.

Jones had been a stockholder and director of a bank in Mineral Springs, which failed in May, 1921. He owed the bank, at the time it closed its doors, $850, evidenced by a note payable to the bank's order. He owned $850 of the capital stock of the bank, against which a stockholder's liability for that amount was being asserted by the State Bank Commissioner, who had taken over the bank.

There was some testimony that a suit was threatened by certain of the stockholders against the officers of the bank for mismanagement, and Jones appeared to have consulted a lawyer in regard to his possible liability on that account. This suit was never brought, however.

The bank was the depository for a large amount of public funds, consisting principally of money belonging to some road districts, but certain officers of the bank made good this deposit. This was not done, though, until after Lou Jones had mortgaged his farm.

Jones was shown to have felt resentful about the bank's failure, and to have said that he would not pay his stockholder's liability until he was compelled to do so, but he stated that he would pay if the court said that he must. A suit to enforce this liability and one on his note to the bank were pending at the time of his death, but judgments on these demands were not recovered until after his death.

Certain demands were probated against Jones' estate, and these, with the judgments in favor of the bank, totaled $2,066.28.

Jones had never been married, and was survived by a brother, who was in impecunious circumstances, a sister, and the widow of a deceased brother, who left surviving him two infant children, and his stepmother. Jones was on the most cordial terms with all these persons, and he spent a portion of the summer before his death in the fall with his sister-in-law, who resided in Oklahoma, and discussed with her the question of her accompanying him on his trip west for his health.

Jones was suffering from consumption, and had been for about two years before his death, and he finally died from this disease. He lived principally with a Mrs. Hendricks, whose son, a young man twenty-two years old, named John B. Hendricks, the defendant below, had been very attentive to him, and who had devoted much of his time to nursing and caring for Jones during the last two years of Jones's life.

Jones applied for and obtained a loan on his farm amounting to $12,000, to secure which he gave a mortgage on the farm, and he also executed a second mortgage on the farm to secure a loan of about $2,000. The testimony is very conflicting as to the value of this land. Certain witnesses testified that the mortgages on the land equaled its value, and that the equity of redemption was worth nothing. According to other witnesses, the land had not been mortgaged for more than half it value. After considering this testimony we have concluded that the equity of redemption was worth as much as $5,000.

After executing this mortgage, Jones gave John B. Hendricks a deed to the fifteen acres of land, and, shortly before his death, he also gave Hendricks $850 in cash. About the same time he conveyed one of the lots in Mineral Springs to his sister and the other to his stepmother. He also paid a small mortgage indebtedness due by his brother, Manning S. Jones, and he assigned to his brother's daughter a life insurance policy having a value of about $800.

After securing the $12,000 loan, Jones took a check for $11,982.41, which apparently represented the net proceeds of the $12,000 loan, to the Citizens' Bank at Hope, Arkansas, where he had never before had any business of any kind. He there took a certificate of deposit payable to John B. Hendricks for $9,500, and deposited $500 to his own credit, and took a cashier's check payable to his own order for the balance.

Hendricks accompanied Jones to the bank when this was done. They returned to the home of Mrs. Hendricks, with whom her son, John B. Hendricks, lived. A sister of

John B. Hendricks testified that, upon the arrival of Mr. Jones and her brother, Mr. Jones delivered the certificate of deposit to her brother, and stated at the time that he gave it to him. A number of other witnesses testified that Jones had told them that he had given the certificate of deposit to Hendricks, and there appears to be no doubt that he made this statement to a number of persons. The certificate of deposit was dated May 31, 1922. ·

Judge Feazel testified that Jones' stepmother was his wife's aunt, and that Mrs. Jones had lived with him as a member of his family for fifteen years, and in this way he became very intimate with Lou Jones. A business matter called Judge Feazel to Mineral Springs, and, after attending to this matter, he called on Mr. Jones. This was about ten days before Mr. Jones died. After a visit of about a half-hour's duration, Judge Feazel started to leave, when Jones called him to the sick-bed and said, "I have given a party some money, and I want to know whether it will stick or not." Judge Feazel advised him that he could not tell unless he knew the manner in which it had been consummated. Jones told him that he had deposited the money in Hendricks' name, and had given Hendricks the certificate of deposit, and that he afterwards had Hendricks convert the certificate into Liberty bonds. Judge Feazel advised Jones that he thought the transaction would be good against everybody except creditors, when Jones expressed his satisfaction by saying, "That is all I wanted to know."

It will be observed that Judge Feazel had not called on Mr. Jones in a professional capacity, and his opinion was not sought until the visit was at an end, and no attempt was made to explain the details of the transaction to Judge Feazel; indeed, Judge Feazel testified that Jones was coughing to such an extent that Jones' conversation was broken and was carried on with difficulty.

The testimony is conflicting as to Jones' opinion as to his own condition. His physician had advised him that he was in no condition to go west, as he contemplated

doing, and, while Jones may have despaired of final and complete recovery, we do not think the testimony shows he was anticipating immediate death.

Jones went to Mineral Wells, Texas, and, on August 26, 1922, he wrote the following letter:

"Mineral Wells, Texas, August 26, 1922.
"Hon. O. A. Graves, Hope, Arkansas.

"Dear sir: In regard to the $9,500 on time deposit at the Citizens' National Bank of Hope, Arkansas. I have this, the 26th day of August, released all of my interest and claim to the above amount to John B. Hendricks.

"I want you to keep this as evidence in case anything ever comes up in court about the above.

"Witness my hand this the 26th day of August, 1922.
                "(Signed) L. P. Jones."

Jones called a notary public, before whom he subscribed and swore to the letter. After doing this, the notary suggested that the matter might be put in better form, and the notary prepared the following statement:

"First State Bank & Trust Company
"Capital One Hundred Thousand.
                "Mineral Wells, Texas, August 26, 1922.

"For value received I hereby transfer and convey all right, title and interest to John B. Hendricks of Mineral Springs, Ark., in a time certificate of deposit given by the Citizens' National Bank of Hope, Ark., for the sum of $9,500, made payable to John B. Hendricks.

"Witness my hand this the 26th day of August, 1922. By (signed) L. P. Jones.

"Subscribed and sworn to before me this the 26th day of August, 1922. (Signed) W. I. Smith, notary public, Palo Pinto County, Texas." (Seal).

A Mrs. Hood was present when these instruments were signed and sworn to, and she and the notary testified that Jones stated at the time that he had given Hendricks the money referred to because Hendricks had rendered him long and faithful services.

Manning Jones, a brother, and Ola Jones, a sister-in-law, of Lou Jones, testified to substantially the following effect: The relationship between them and their brother was intimate and affectionate. Their brother had never despaired of recovery. He talked with them frequently and freely about his business affairs, and told them about the mortgages on his land, but did not mention the alleged gift to Hendricks. Lou Jones expressed to them the fear that the bank failure might impoverish him, and he stated to them that he derived a fund by mortgaging his farm which would enable him to go west for his health, and by the purchase of the Liberty bonds he had provided an income upon which he could live.

The mortgages to the loan company cannot be set aside, because it is conceded that its attitude is that of an innocent purchaser, and it is the opinion of the majority that the deed to Hendricks for the fifteen-acre tract cannot be set aside because it is not required to pay the debts of the intestate. The same thing may be said of the deeds to the town lots. It may also be said in regard to the deeds to the lots that they were not embraced in this suit, and there was no prayer that they be set aside.

The majority are of the opinion, however, that the alleged gift of the certificate of deposit should be set aside, for the reason that Jones never intended to pass title thereto.

It is, of course, conceded that Jones had the right to select the beneficiary of his bounty, and that, except as to creditors, he had the right to give his property to whom he pleased, and his heirs-at-law would have no right to complain that property had been given to a person who was not related in any degree to the donor.

It is true that Jones resided for the last two years of his life at the home of Hendricks' mother; but he was there as a boarder, and no contention is made that he did not pay full board. It is true also that Jones was under obligations to Hendricks, who had rendered him attentive

and constant service. The relation between Jones and Hendricks was close and intimate, and Jones unquestionably regarded Hendricks with a feeling of gratitude and affection. But it is also true that there was no estrangement between Jones and his brother and his sister and his sister-in-law, who was the mother of his deceased brother's infant children.

It is the opinion of the majority that the conduct of Jones was as much influenced by the pending and threatening suits against him as by the condition of his health. The testimony shows that, long after the alleged gift of the certificate to Hendricks, Jones still entertained hope of recovery, or, at least, of prolonging his life, and, on the day of his death, spoke of going west for his health.

We have no doubt that Jones frequently stated he had given the money represented by the certificate of deposit to Hendricks, and we doubt not that the conversation with Judge Feazel occurred just as Judge Feazel detailed it, but, as we have said, Jones did not attempt to detail the circumstances to Judge Feazel.

In the opinion of the majority of the court, Jones had given the certificate to Hendricks, but he had not done so for the purpose of passing the title. There was confidence and understanding between Jones and Hendricks, and there was compensation to Hendricks, for he was given a deed to the fifteen acres in the town of Mineral Springs and $850 in cash, and what else may have been given him the testimony does not disclose.

If there was ever a gift, it was consummated at the home of Mrs. Hendricks, in the presence of Hendricks' sister. Jones then and there stated he had given the certificate to Hendricks and delivered it to him. If there had been an intention to pass the title, that intention became irrevocable on the delivery of the certificate, yet the testimony is that, on more than one occasion after that, Jones spoke of the government bonds, which had been purchased with the proceeds of this certificate, after it was cashed, as his own, and he stated why he

bought them and the use he intended to make of the interest derived from them. It is true also that, when Jones decided to cash the certificate, he told his brother Manning that he was going to do so, and, at his request, Manning Jones went with Hendricks to Hope to cash the certificate and bring the proceeds to Mineral Springs. This was done September 20, 1922, which was, of course, subsequent to the execution of the instruments at Mineral Wells, Texas, set out above, the date of those instruments being August 26, 1922.

Notwithstanding the circumstances detailed, we would feel that there was such doubt about Jones' intention in delivering the certificate to Hendricks that we would not disturb the finding of the chancellor as being clearly against the preponderance of the evidence; but there was offered in evidence a letter, which admittedly was written by Jones, which tips the scale and makes the finding of the chancellor appear to the majority to be clearly against the preponderance of the evidence.

As we have said, the deposit was made May 31, 1922, and that night the certificate was delivered to Hendricks at the home of his mother, in the presence of his sister, yet on June 16, 1922, he wrote the following letter:

"6-16-22.

"John Burton: I call Gus Graves at Hope the night I was there and told him to write you or me at M. S. about the matter we have been talking about. If he has got the kind that he thinks is best for us, I want you to go to Hope and take the slip of paper, you know, and have them to wire for the full amt. you have; and if it costs more than 100 cts. on the $1, that you draw on my act. for the dif.

"You may be sure to take this and let Gus Graves see it, and he will understand what I mean. I also want to rent a safe deposit box, and when they come you can go down to Hope and put them in it. You be sure and understand just what I mean. I think I want the 4 and a quarter B's of 1936, but Gus will advise you best. (Signed) Lou.

"Don't let anybody know anything."

We think this letter is incompatible with the idea that Jones had relinquished dominion and control of the certificate, although he had parted with its possession. He knew what the certificate was, but he did not refer to it as such; it was called a slip of paper, manifesting a purpose to conceal what he had done and was intending to do. The postscript was an additional admonition to secrecy.

Fearing that he might not be able to buy $9,500 in bonds for the $9,500 certificate, he proposed to pay out of his own funds the "dif.," which manifestly meant difference. He gave detailed directions as to the kind of bonds he desired to buy, and, recognizing their value, he gave directions about renting a safe deposit box, obviously for the purpose of keeping them securely, and this box was to be rented for himself, and not for Hendricks. It is true the bonds, when purchased, were registered in the name of Hendricks, but the majority think this was done pursuant to the understanding that Hendricks should hold them as bailee for Jones.

The transaction was to be explained, so the letter directed, to Jones' friend and attorney, who would understand the transaction between the parties. No reflection of any kind is implied in this statement, as the attorney referred to was serving his client in a legitimate and proper manner. This attorney, who is also an attorney of record in the case, but not a party to the litigation, did not testify, as he might have done, and have refuted the testimony of other witnesses that Jones was seeking to provide a fund which creditors could not reach, and which would enable him to go west for his health. If Jones had in fact given the certificate to Hendricks on the day he delivered it to him, the instruments signed and sworn to by Jones in Mineral Wells on August 26, 1922, were unavailing. Those instruments recite that he that day — August 26 — gave the certificate to Hendricks, whereas, if there was a gift at all, the gift had been consummated four months before. And while it is true that

the notary who took the affidavits to the instruments executed in Mineral Wells, Texas, as well as Mrs. Hood, who was present at the time, both testified that Jones stated he was giving the money to a friend who had rendered him invaluable service, Jones also stated to the notary that he had a friend who was a lawyer who would understand the letter and transfer.

Another circumstance in the case which shows that Jones was contemplating putting his property beyond the reach of his creditors, if judgments were recovered against him, which he was not willing to pay, is that he took his leases and other contracts with his tenants on his farm for the year 1922 in the name of Hendricks, and no contention is made that Hendricks was given any interest in the farm itself.

It is urged that the testimony of Manning Jones and that of Mrs. Ola Jones, as to statements made to them by Jones after the alleged gift, was inadmissible, and should not be considered; but we are of the opinion, however, that these statements are admissible upon the theory that a *prima facie* showing of a conspiracy between Lou Jones and Hendricks had been made, and that this conspiracy was to cover up assets of Lou Jones until the pending and threatening suits were disposed of, and this conspiracy had not been consummated at the time of Lou Jones's death.

The case of *Cox* v. *Vise,* 50 Ark. 283, was an action by the assignee of an insolvent merchant against an officer to recover a stock of goods assigned for the benefit of creditors, and subsequently seized by the officer under an order of attachment obtained against the assignor by one of his creditors on the ground of fraud in disposing of his property. There was evidence having a tendency to show that the assignor and the plaintiff confederated together to defraud the former's creditors. Certain declarations of the assignor tending to show fraudulent intent, made after the assignment but while the assignor was engaged in the prosecution of the conspiracy, were

objected to; but the court held these declarations were admissible, although made after the execution and delivery of the deed of assignment. The court there said: ''The statements made by Hamilton (the assignor) testified to by Childs, were made after the execution and delivery of the deed of assignment. It is well settled that the declarations of a party to a sale, transfer, or assignment, going to impair the vested rights of one claiming under him, and made after the sale, transfer, or assignment, are inadmissible. The reason of the rule is: 'After a vendor has parted with his property he has no more power to impress the title, by either his acts or his declarations, than a mere stranger.' But there is an exception to this rule. It is 'that when a fraudulent combination is established, the acts and declarations of any one of the parties thereto, while engaged in the prosecution of the common design, may be proved against the others.' They are competent evidence to show the intention of the parties. Before such declarations are admissible under the exception to the rule, 'a foundation must be first laid, by proof, sufficient, in the opinion of the judge, to establish, *prima facie*, the fact of a conspiracy between the parties, or proper to be laid before the jury as tending to establish such fact.' Evidence of 'a very slight degree of concert or collusion' will be sufficient. Mr. Greenleaf, in treating of this subject, lays down the rule as we have stated it, and adds: 'Sometimes, for the sake of convenience, the acts or declarations of one alleged conspirator are admitted in evidence before sufficient proof is given of the conspiracy, the prosecutor undertaking to furnish such proof in a subsequent stage of the cause. But this rests in the discretion of the judge, and is not permitted, *except under particular and urgent circumstances*, lest the jury should be misled to infer the fact itself of the conspiracy from the declarations of strangers.' It is obvious, from the rule and exception, as stated, that no reversible error, or error prejudicial to an appellant, can be committed, if, subse-

quent to the admission of the evidence of the declarations. evidence tending to establish the conspiracy or confederacy were afterwards introduced. If evidence of the declarations was admissible in any order, as shown by the evidence, no injury could have been done by not having observed the order. But, as said by Mr. Greenleaf, the ordinary practice should not be departed from, 'except under particular and urgent circumstances.' (Numerous cases cited).''

It is the opinion of the majority that, when the testimony is considered in its entirety, a valid gift was not shown. While it is essential that possession be delivered, mere delivery is not sufficient. There must be an existing intention accompanying the act of delivery to pass the title, and, if this does not exist, the gift is not complete. *Carter* v. *Greenway,* 152 Ark. 339; *Ammon* v. *Martin,* 59 Ark. 191; *Hatcher* v. *Buford,* 60 Ark. 169; *Lowe* v. *Hart,* 93 Ark. 548; *Harmon* v. *Harmon,* 131 Ark. 501; *Gordon* v. *Clark,* 149 Ark. 173; *Lehman* v. *Broyles,* 155 Ark. 593.

The majority do not think that Lou Jones ever surrendered or intended to surrender dominion and control of this certificate or of the bonds into which it was converted, and the gift was therefore never consummated, and the court below erred in holding to the contrary.

The court below, after deciding there was a valid gift, directed Hendricks to deposit in the registry of the court the sum of $2,000 in cash to insure the payment of the debts. This was done, and that sum is available for that purpose. In addition, the administrator in his inventory shows assets of the value of $1,300.

Thus there is available a sum more than sufficient to pay all the debts, and, this being true, the creditors are not concerned about the deeds or the mortgages, and the heirs have no right to complain about the deeds or the mortgages. This is true now because the $2,000 refunded by Hendricks, which was a part of the alleged gift of $9,500, together with the assets in the hands of the

administrator and the value of the equity of redemption in the lands, suffices to pay the debts. In other words, Jones was in fact a solvent man, and, as such, had the right to dispose of his property in the manner herein stated. But his apprehensions about the suits, which were never brought, to enforce a possible contingent liability, caused him to conspire with appellee Hendricks to conceal the certificate of deposit and the proceeds thereof, and, in the opinion of the majority, there was never any intention to vest in Hendricks the title to the $9,500.

The decree upholding the gift to Hendricks of the certificate is reversed, but, in all other respects, it is affirmed, and the cause will be remanded with directions to set aside the finding that there had been a gift of the $9,500 to Hendricks, and. to enter a decree directing Hendricks to pay the $9,500 over to the administrator of the estate of Jones.

The relief here awarded is not granted under the provisions of § 70, C. & M. Digest, but under the allegations of the amended complaint (which the majority thinks the testimony sustains) that there was never in fact a gift of the $9,500, and that such possession thereof as Hendricks had was that of a mere bailee.

McCulloch, C. J., (dissenting). I am unable to agree with the conclusions of law announced by the majority, that the testimony of certain witnesses introduced by appellants tending to prove the statements of the donor, Jones, after the consummation of the alleged gift, was admissible. It is elemental in the law of evidence that the declarations of a party to a sale or gift or other transfer of property, made after its consummation, tending to impair vested rights under such transfer, are, with certain exceptions which I do not think apply to the present case, inadmissible. It is unnecessary to cite authorities in support of that proposition, for the principle is clearly announced in the very decision on which the majority rely. *Cox* v. *Vise*, 50 Ark. 283. The exception to the rule found in that case does not apply to the

present one, for that was a contest between the assignee and the creditors of an alleged fraudulent grantor concerning the validity of the assignment. Creditors of a fraudulent grantor do not, after the grant, stand in privity with the grantor, but their relation is a hostile one, and they have the right to prove, as long as there exists a conspiracy between the fraudulent grantor and his grantee, declarations of the former tending to impeach the good faith of the transaction.

In the present case, however, appellants are heirs of the donor, Jones, and do not stand in any such relation, for they can assert only such rights as Jones himself could have asserted if alive. If Jones were alive and was suing for the recovery of the personal property involved in this controversy on the ground that it was a bailment and not a gift, it would scarcely be contended that proof of his own declaration after the consummation of the gift would be competent evidence against his alleged donee. Since it is seen that appellant stands in no better attitude that Jones himself would have stood, it necessarily follows that this testimony was not competent.

This testimony is conceded to be important, and is considered by the court as turning the scales in favor of appellants. Without this testimony in the case, I am clearly of the opinion that the weight of the evidence is not against the finding of the chancellor on the issues of fact, but that the preponderance is clearly in favor of the chancellor's finding.

The letter of Jones to appellee, dated June 16, is not without some force as tending to show that the money was turned over to appellee pursuant to a plan to defraud Jones' creditors, but whatever appears from the recitals of that letter tending in that direction is entirely overcome by the other testimony as to subsequent declarations of Jones, clearly manifesting his intention to make a gift to appellee, rather than a mere bailment for the purpose of hiding the property from creditors. Whatever may have occurred theretofore, the written declara-

tions of Jones in his sworn statement, dated August 26, 1922, evidences in the most solemn manner his intention to make an absolute gift to appellee of the property in controversy.

My conclusion therefore is that the decree should be affirmed, and I am authorized by Mr. Justice HART to say that he shares the views here expressed.