BURKS *v.* BURKS.

5-87                                   257 S. W. 2d 369

Opinion delivered May 4, 1953.

*Robert J. Brown,* for appellant.

*Irvin M. Brewer,* for appellee.

GRIFFIN SMITH, Chief Justice. The issue is whether two checks drawn in an unusual manner against the maker's sufficient bank balance vested property rights in the payee, or whether express wishes of the maker, who acted in expectation of death, should be disregarded. If the latter course should be pursued the administrator would take charge of the money, paid into court when Peoples National Bank filed its interplea. [1]

Following a protracted illness having its inception prior to November, 1951, [Mrs.] Ella Mae Burks died intestate December 15, 1951. She had been attended by

---

[1] Mrs. Burks' bank balance was $2,200.

her warm personal friend and sister-in-law, Mrs. Mildred Burks. November 17th Ella Mae wrote and delivered to Mildred Burks a check for $1,000. In the lower left hand corner the check-maker wrote "at my death". The second check (Dec. 10th) was in favor of Mildred Burks for $500 and bears the same notation.

The complaint, which is sworn to, asserts that for many months Ella Mae had not lived with her husband, D. A. Burks. She had formerly been married to a man named Raybon, and their son, Bedford, is confined to an institution for the mentally deficient, and has been so confined for many years.

When the Peoples National Bank refused to pay the checks because of Mrs. Burks' death prior to their presentation, Mrs. Mildred Burks applied for an injunction to restrain the bank from paying $1,500 to any other person, A. D. Burks having in the meantime been appointed administrator. An alternative prayer was that the amount be paid into court. The bank was allowed a fee of $50 for its legal expense, to be taken from the item of $1,500 placed in the court's registry. The fee is questioned here.

Mrs. Mildred Burks testified that her sister-in-law and her husband had been separated on a previous occasion, but adjusted their differences for a while. A second separation, however, occurred in circumstances that were not explained. Because of friendship's ties and a relationship that had prevailed for a long period of time, the two "inlaws" maintained a status of closest coöperation. Ella Mae, when her health failed, and in the absence of her husband, went to live with appellant. From October until death occurred in December Mrs. Burks was in St. Vincent's Hospital three times. The patient had told appellant she wanted her to buy presents for the afflicted son. An explanation of the transaction is shown in the footnote. [2]

---

[2] In substance, Mrs. Mildred Burks testified: "[Ella Mae] had told me a day or two before that she wanted me to buy some Christmas presents for her son, Raybon. When I went out there—I think it was on Monday—she said, 'Mildred, will you get my glasses out of the drawer, and my checkbook and pen out of my purse? I want you to write a check for me.' When I opened the checkbook I saw a check [had already

The stub from which the $1,000 check was detached contains this writing by Ella Mae: "Five hundred dollars given to Bedford Raybon, $4 a month, $1 every other week; $500 for your personal use. Ella Burks".

Appellees call attention to the fact that the checks were not presented for payment until January 23, 1952—thirty-nine days after death of the drawer.

Appellees rely upon two propositions: Ark. Stat's, § 68-1304, relating to gifts where there was no consideration, and the superior right of creditors. Such gifts are declared void "even against the grantor unless possession really and bona fide accompany such gift or conveyance".

The other point is that an uncertified check, being revocable, does not pass a present interest in the subject-matter and the order of payment is, as a matter of law, revoked when the maker dies.

Mr. Justice HART discussed gifts *causa mortis* and gifts *inter vivos* in *Carter* v. *Greenway,* 152 Ark. 339, 238 S. W. 65. There was no recorded dissent to Judge HART's statement that the trend of authority, and the better reasoning, is that a check may be the basis of a gift *causa mortis* where creditors are not concerned. This expression, however, appears in the opinion: "When the delivery of the check is coupled with an intent to transfer a present interest in the money, and no revocation is attempted, the intent of the donor should be given effect".

Appellees call attention to the condition they say must attach when payment of a check is demanded after death of the maker, that is, delivery of the check must be coupled with an intent to transfer a present interest

---

been made out] to me for $1,000. It was dated Nov. 17, and signed 'Ella Mae Burks'. She then said, 'Write out a check [for $500] and make it payable to yourself,' . . . and I said, 'What do you want with $500 up here?' and she said, 'I want you to have it.' [She then added]: 'You see a check for $1,000 made to you: I am going to die—I will never get out of this bed.' But I said to her, 'Let's wait until tomorrow,' but she got very nervous and replied, 'I want to write the check,' so I wrote it and she said, 'Hand me something to sign it with,' and I handed her my purse, and she signed it and wrote, 'At my death.' She [then] said, 'He has spent all the money of mine he is going to spend'."

in the money. Here, they say, is the absent condition, for Mrs. Burks' direction was that the check should be paid *at* her death. The opinion appears to have been explained by the subjoined quotation from Morse on Banks and Banking—a correct rule to the effect that there may be "a gift of a check *causa mortis*". The Morse rule analyzed by Judge HART is that there must be such a delivery by the donor as to clearly indicate his intent to transfer the property from himself, and an actual transfer of the rightful control of the property. The quotation then continues: "But this, we contend, is done when he gives a check to the donee, or to another to give to the donee, and does not revoke before the delivery is made according to instructions. In this peculiar case of a check the donor could revoke during his life; but as against the rest of the world it is a clear delivery of control of the money, and no one but the creditors of the donor has a right to object. [The creditors] have a superior equity to the donee; but, if the donor is solvent, and continues in the same mind till his demise, what right has any one else to interfere with his clear intent? . . .

"The donor has a right to do with his property what he chooses, and his intent, clearly indicated, should be respected, and his personal representative has no right to frustrate his wish. The continuous progress of legal thought on this subject of gifts points to the conclusion set forth above, viz., that, although a gift of a check cannot give an action against the donor himself, nor prefer the donee to creditors, yet it should be held good otherwise. And if the donor is solvent and does not revoke during his life, it ought, we think, to be good against the deposit, and against his personal representatives when they have obtained possession of the deposit on which the check was drawn. . ."

*Smith, Administratrix,* v. *Clark,* 219 Ark. 751, 244 S. W. 2d 776, was a case where the check was cashed during the lifetime of the maker. Conflicting decisions were mentioned, coupled with the statement that many courts hold that delivery of the donor's own check in expectation of death is not the subject of a gift, either

*inter vivos* or *causa mortis,* where such check is not accepted or paid by the bank before the donor's death. (Citing cases). "But", says the opinion, "this court is committed to the so-called minority rule which holds that one's check or draft may be the subject of a valid gift by the maker, although it is not presented for payment until after the death of the donor".

Mr. Justice Wood, *Hatcher* v. *Buford,* 60 Ark. 169, 29 S. W. 641, 27 L. R. A. 507, made an interesting review of the law of gifts such as we are discussing here, adverting to Justinian's definition embracing requisites essential from a factual standpoint—that is, circumstances attending the gift may be such that the donor prefers to retain dominion over it rather than have the donee acquire it, "but he prefers the donee should have it rather than his heirs". Judge Wood then said: "We think the better doctrine upon the transfer of the title to gifts *causa mortis* is that which accords with Justinian's definition, and recognizes the subject-matter of the gift as becoming the property of the donee in the event of the donor's death, *i. e.,* the donor's death is a condition precedent to the vesting of the title to the thing given in the donee."

In the quotation from Morse, used by Judge HART in the Carter-Greenway case, the inconsistency of a different rule was emphasized by a statement that "It does not seem sensible to say that a *donatio causa mortis* is a gift to take effect in case of death, and then to say that the donor did not intend it to be good unless it took effect before his death".

In *Gordon* v. *Clark,* 149 Ark. 173, 232 S. W. 19, A. T. McMillan, realizing the approach of death, gave Wilmot Clark certain things of value, and his bank book. It was held that this did not have the effect of transferring to Clark the bank balance, since "the book was only evidence of the state of the account".

A bank certificate of deposit was treated as a chattel subject to pass upon delivery as a gift *inter vivos,* notwithstanding the fact that the donor knew he was about

102

to die; but there could be questions of fact, (a) whether the owner of the certificate intended, at the time of delivery, that title should pass and the recipient's purpose was to receive it; (b) the jury could have found that the owner, being on his death bed and expecting soon to die, gave the certificate to the recipient, "which was a symbolic delivery of the money itself". In the second case the gift would be *causa mortis*.

In the case at bar all of the testimony, and the checks, disclosed an intent upon the donor's part that at the instant of death the money should pass to appellant—subject, however (in respect of $500) to the trust imposed for the benefit of the giver's incompetent son.

The trial court's action in allowing the interpleader a $50 fee is affirmed under authority of Ark. Stat's, § 27-816, and our thought is that the evidence does not show that a greater amount was earned. The judgment directing delivery of the balance of $1,450 to appellees is reversed, with directions that an order be entered not inconsistent with this opinion.

Mr. Justice WARD dissents from the court's action in affirming the payment of an attorney's fee to Peoples National Bank.