VINCENT, ADMINISTRATOR *v.* VINCENT.

5-525 274 S. W. 2d 772

Opinion delivered January 17, 1955.

[Rehearing denied February 21, 1955.]

*E. G. Ward, Gerald Brown, Kirsch & Cathey, George Edward Thiel* and *Verlin E. Upton,* for appellant.

*Lee Ward,* for appellee.

GRIFFIN SMITH, Chief Justice. When Cullen M. Vincent died intestate August 26, 1953, a substantial deposit stood to his credit in the Bank of Rector. Emeline Vincent, the decedent's sister, sued George Vincent, administrator, and the bank, alleging that by virtue of a signed card containing written directions a joint tenancy was created with right of survivorship in the plaintiff, Act 260 of 1937, Ark. Stat's § 67-521. The bank filed an answer affirming its refusal to admit that a joint tenancy had been created, or that with delivery of the signature card Cullen M. Vincent made appellee a gift of the money.

The chancellor held that under principles laid down in two recent cases the tenancy was created. *Burks* v. *Burks,* 222 Ark. 97, 257 S. W. 2d 369, 38 A. L. R. 589; *Powell* v. *Powell,* 222 Ark. 918, 263 S. W. 2d 708.

Four persons, alleging that they were heirs of the decedent, intervened.

Evidence upon which the chancellor based his decree is substantially as follows:

Mrs. C. W. Terry, a practical nurse in the Vincent home, was employed for about five weeks and came into frequent contact with Emeline, for whom Cullen M. Vincent entertained "uppermost regards all the time, trying to spare her to take care of his business". The witness overheard a conversation Friday morning, August 21st, regarding the bank account. Cullen asked his sister to procure a signature card so that he might "fix up" his bank account. When Emeline procured the card and took it to her brother Mrs. Terry propped him up in bed. The sick man spent fifteen or twenty minutes reading it. "Miss Emeline then brought a pen and Mr. Cullen signed the card on both sides—I watched him".

Mrs. Terry further testified that it was near three o'clock when Emeline left with the card, but she returned and said, "You signed the wrong card; this is just the same as a deed to the bank account and I have always told you not to do that". The sick man rested for a short period and replied, "I signed the card I wanted to sign". Late Friday afternoon Mr. Vincent directed Emeline to bring Cashier Ode Harper of the Bank of Rector "out here Monday and I will straighten you both out".

When Mrs. Terry was bathing Vincent Saturday he asked if she had been paid. To her statement that she had not, coupled with an admonition "you are not to worry about that", Vincent replied: "I gave Miss Emeline the bank account and she will pay you". After Vincent's death Mrs. Terry was paid by the administrator. As a result of questions asked by the chancellor Mrs. Terry supplemented her testimony with the explanation that Vincent, when discussing the wages due her, said: "I gave the bank account to Emeline because she may be in this condition some day—she will pay you". The patient died early Wednesday morning following the Friday transaction. Mrs. Terry did not, prior to Vincent's death, tell Emeline she was to make the

payment, but she did relay the information before the claim was filed with the administrator.

O. A. Harper, who for 25 years had been cashier of the Bank of Rector, testified that Vincent's balance was $7,074.66; that the ledger carried the account as C. M. Vincent, and that prior to his death the depositor had not personally requested that any change be made.

Shortly before Vincent's death Emeline called at the bank and in substance suggested that an arrangement ought to be made whereby she could check on her brother's account for necessary expenses. Harper explained that it would be necessary for the bank to have authority from Vincent in order to honor checks. The cashier's understanding was that Emeline wanted authority to draw on the account to pay current bills. She was given two cards. Later—it might have been the next day—Emeline presented one of them. The card not accounted for (in respect of which no question is made) would, when signed by the depositor, authorize the person designated to act as agent in drawing checks. The one returned by Emeline was printed on both sides. One side called for the signature of the depositor and that of the person authorized to make withdrawals. This side was signed by Vincent, but not by Emeline. The other side contained the exact wording copied in the *Powell* case with a heading in blackface type "Joint Account— Payable to Either or Survivor". Our former holdings have been that such directions, when genuine, are sufficient to create a joint tenancy.

Cashier Harper told Emeline that before the bank would honor the card it would be necessary for Vincent to write a check for the amount of his balance "so a new account can be opened". Emeline retained the card, "and the check I requested has never been presented".

On direct examination Harper had said that *C. M. Vincent* "is not the signature that he used to sign, but it appears to be". On cross-examination this phase of the questioning drew the answer: "I am not questioning the genuineness of the signature of C. M. Vincent, and

I am not willing to tell the court that I know that he didn't sign it''.

Harper further testified that he did not pass on the genuineness of the signature when Emeline presented the card. A check dated August 21, 1953, admittedly written by Vincent, was shown the witness, who said: ''I don't see a great deal of difference between this check and the signature card. The longer Mr. Vincent was ill with tuberculosis there was some variation in his signature. He didn't write with as strong a hand as he [formerly] did''.

It was Harper's thought that the card, ''within itself, giving both sides consideration, did not authorize us to change [the account] to one joint tenancy''.

The court made an express finding that there was no evidence of mental incapacity:—''He delivered the card to [Emeline], said that he had signed [the one] he intended to sign, and that he had given his money to the donee. If the card [Emeline presented to her brother] was not what he intended to sign he could have said, ''This is not what I sent you for; this is not what I want to do; and I am not going to sign it''.

The chancellor, in an opinion separate from the decree, expressed disagreement with the two cases cited as authority. His apprehension was that the result was in conflict ''. . . with the provisions of the statute pertaining to the disposition of property; and, to my mind, it opens an avenue of . . . perjury, forgery, and fraud''.

While we concur in the apprehension that these elements—perjury, forgery, and fraud—are possibilities in many cases, yet the practical answer is that a chancellor will exhaust the available fields of investigation in sifting the evidence and satisfy himself that the donor's actions were *bona fide* before entering a decree.

Here there is an affirmative finding that Vincent knew what he was doing; that he executed the card for the purpose of creating the joint tenancy, with sur-

vivorship, and if his purpose had been otherwise there was ample opportunity to express a contrary view or pursue a different course. So we have findings made by a highly capable chancellor predicated upon facts he did not doubt, to which a ruling at variance with his own conception of what the law should be was applied. One less sensitive to duty might easily have expressed controlling doubt regarding Vincent's purpose and Emeline's actions; but that is not the case before us.

The *Burks* case dealt with two checks issued by the intestate to her sister-in-law, bearing the notation, "at my death". The holding was that where a solvent person having the capacity to contract had, in expectation of death, executed checks in circumstances disclosing an intent that at the instant of death the money on deposit should be paid, there was a completed gift. Attention was directed to an opinion by Mr. Justice Hart, *Carter* v. *Greenway*, 152 Ark. 339, 238 S. W. 65, 67. As a quotation from Morse on Banks and Banking, this sentence appears: "It does not seem sensible to say that a *donatio causa mortis* is a gift to take effect in case of death, and then to say that the donor did not intend it to be good unless it took effect before his death".

While the factual structure in the *Burks* case differs from essential testimony in the controversy before us, Judge Hart's opinion, which admittedly follows the minority rule, is well worth reading.

The *Powell* case, like the instant appeal, turned on the donor's intent; but there the gift was held to have been incomplete.

The testimony of Cashier Harper was that he did not remember whether he told Emeline when she procured the cards that a check drawn by the depositor would be necessary, "but I certainly did so when the card was returned". Therefore, on behalf of the bank, *he* declined to create the joint account.

During oral presentation here the point was stressed that Emoline did not leave the card with the bank. There

was the insistence that Harper in his capacity as cashier had the right to demand Vincent's check as a condition precedent to creation of the joint account.

Contrary to these views, we think that written notice to the bank was sufficient. The cashier's action was not inappropriate as a precautionary step to guard the bank against fraud, but unless the requirement should be brought to the depositor's attention (and here it was not) we see no persuasion in the argument that the jointure failed because the owner of the account neglected to do something not suggested in the bank's prepared form.

It is urged that Emeline's action in delivering to her brother only one of the two cards discloses evasive conduct and does not comport with the rule in *Baker* v. *Eibler,* 216 Ark. 213, 224 S. W. 2d 820. It was there said that where a confidential relationship exists the claim of a gift *causa mortis* imposes a heavy duty of proof on the donee, the mere existence of the relationship creating a rebuttable presumption that the gift was obtained by undue influence.

Circumstances emphasized by appellants in support of the theory of fraud or undue influence are Emeline's conduct in presenting but one card to her brother, and the depositor's statement, testified to by Mrs. Terry, that Vincent told Emeline to have Harper call on Monday so he could straighten them both out.

On factual matters we agree with the chancellor. In applying these facts to the rights created we adhere to our former opinions, and affirm.

Mr. Justice McFADDIN, Mr. Justice MILLWEE, and Mr. Justice GEORGE ROSE SMITH dissent.

GEORGE ROSE SMITH, J., dissenting. I think this decree should be reversed. It is often said that the courts should not and do not make contracts for the parties, and in my opinion that is even more reason for saying that the courts should not make gifts for the parties. Yet that seems to be what the majority are doing in this instance.

There come to mind three separate ways by which C. M. Vincent might have transferred this bank deposit to his sister Emeline. First, it might have been done by will, but there is no suggestion that a testamentary disposition was made. Second, an *inter vivos* gift might have been effected, but the proof does not sustain the appellee's contention that a gift was completed. The law sensibly requires that a gift be consummated by delivery, which vividly brings home to the donor the fact that he is parting with his property and at the same time supplies the donee with positive concrete proof that a gift was really intended. Here C. M. Vincent probably had, as Professor Brown expresses it in § 39 of his work on Personal Property, "two contradictory intentions, one, the general desire to make a gift, and two, the desire to retain control over the property until some future event, usually the donor's death, renders his first desire irrevocable. This, however, under the law cannot be accomplished. A valid gift requires that the donor presently relinquish to the donee full dominion and control over the thing given." It goes without saying that C. M. Vincent did not release control over this bank account during his lifetime. Had Emeline attempted to assert the existence of a completed gift before her brother's death her complaint would obviously have been demurrable, for C. M. Vincent undoubtedly intended to and did retain at least partial control of the account. In order for the bare fact of death to complete the gift the statute of wills must be complied with.

Third, a joint bank account might have been created, which is the view taken by the majority opinion. It seems to me that the majority have confused Vincent's absolute power to give away his property, a power which he did not exercise, with his limited privilege of entering into a contract with the bank. Our statute permits a bank to set up joint accounts with the right of survivorship, but certainly no banking institution is required to establish accounts of this kind. The relationship being purely contractual, every bank is free to adopt a policy of refusing to accept any joint accounts whatever. Since the Bank of Rector had the power to reject any application for a

joint account, it certainly had the authority to impose any conditions that it chose. By the undisputed evidence its rule was that a single account could be made into a joint one only by the presentation of a check for the sum on deposit. I am at a loss to understand the majority's suggestion that the Bank of Rector was under some duty to embody this requirement in the language of its signature card. It was certainly enough for the bank to bring the requirement to the attention of Vincent's sister, who acted as his agent in the matter; her knowledge was in law his knowledge. That was done, but Vincent failed to accomplish the requested transfer of funds, even though the proof shows that he was still able to, and did, write another check upon the account. It could not conceivably have been contended, one hour before C. M. Vincent's death, that there had been created a joint account which the bank was bound to honor. That being true, the account now comes into existence not by the act of the parties but by the intervention of the court.